IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re:<br><br>GROUP RESOURCES<br>ACQUISITIONS, LLC, *et al.*,[1]<br><br>      Debtors. | Case No. 24-59671-SMS<br><br>Chapter 11<br><br>(Jointly Administered) |

## DEBTOR'S APPLICATION
## FOR ENTRY OF AN ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF GLASSRATNER ADVISORY & CAPITAL GROUP, LLC DBA B. RILEY ADVISORY SERVICES TO PROVIDE THE DEBTORS A CHIEF RESTRUCTURING OFFICER AND CERTAIN ADDITIONAL PERSONNEL AND (II) DESIGNATING MARSHALL GLADE AS CHIEF RESTRUCTURING OFFICER, EFFECTIVE AS OF NOVEMBER 4, 2024

Debtor Group Resources Acquisitions, LLC ("GRA") and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession (collectively, "Debtors") and by and through their undersigned counsel, hereby submit this *Application For Entry of an Order (I) Authorizing the Employment and Retention of GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel and (II) Designating Marshall Glade as Chief Restructuring Officer, Effective as of November 4, 2024,* pursuant to 11 U.S.C. §§ 105 & 363 and Federal Rule of Bankruptcy Procedure 2014, seeking to employ Marshall Glade ("Mr. Glade") and B. Riley Advisory Services ("B. Riley"). In support of the Application, Debtors respectfully show the Court as follows:

---

[1] The following cases are being jointly administered with Group Resources Acquisitions, LLC: Employee Benefit Concepts, Inc. (24-59673-SMS); Group Resources of Iowa, LLC (24-59675-SMS); and Group Resources Incorporated (24-59729-SMS).

1

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are Sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.      The Debtors consent to the entry of a final judgment or order with respect to this Application if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PROCEDURAL POSTURE

5.      On September 13, 2024 (the "Petition Date"), GRA, Employee Benefit Concepts, Inc. ("EBC"), and Group Resources of Iowa, LLC ("GR Iowa") filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"). On September 16, 2024, Group Resources Incorporated filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

6.      No trustee has been appointed, and Debtors continue to operate their businesses and manage their affairs as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7.      No creditors committee has been appointed in any of the bankruptcy cases.

8.      On September 25, 2024, an order was entered granting Debtors' *Emergency Motion for Entry of Order Directing Joint Administration of Chapter 11 Cases* (Doc. No. 17)[2] and causing Debtors' cases to be jointly administered.

## BACKGROUND FACTS

9.      Debtors are all third-party administrators ("TPAs") for single employers who have self-funded health plans, and provided associated services such as stop loss placement and consulting.  Declaration of Andy Willoughby (Doc. No. 7; "Willoughby Declaration"), ¶ 9.

10.     Insofar as Debtors have been able to determine, in or around January 2017, Mr. David Obermeyer ("Mr. Obermeyer") – former CFO of the Debtor entities – began embezzling funds from the three Debtors other than GRA. Willoughby Declaration, ¶ 12.

11.     After GRA was formed in October 2018, Mr. Obermeyer also began embezzling funds from GRA. Willoughby Declaration, ¶ 13.

12.     The Debtors' CEO, Mr. Willoughby, has testified that he did not discover the embezzlement of funds from Debtors until March 2024. Willoughby Declaration, ¶ 14.  When Mr. Willoughby discovered Mr. Obermeyer's embezzlement, Mr. Willoughby terminated him from his roles at Debtors. *Id.*  Mr. Willoughby also consulted with legal counsel regarding possible remedies, and advised law enforcement officials, including the Federal Bureau of Investigation, which began a criminal investigation into Mr. Obermeyer's actions. *Id.*

13.     Mr. Obermeyer's embezzlement involved taking client funds from Debtors and their clients, putting those funds in GRA and GR Iowa accounts, and then using those GRA and GR Iowa accounts to withdraw funds in cash, transferring or wiring funds directly to himself, and

---

[2] In the Employee Benefit Concepts, Inc. bankruptcy this motion was docket number 10, in the Group Resources of Iowa, LLC bankruptcy this motion was docket number 10, and in the Group Resources Incorporated bankruptcy this motion was docket number 10.

transferring or wiring funds directly to third parties. Willoughby Declaration, ¶ 15.

14.    In addition to taking client funds, Mr. Obermeyer also took Debtors' revenues for himself. Willoughby Declaration, ¶ 16.

15.    Mr. Obermeyer took a minimum of Eight Million One Hundred Thousand Dollars ($8,100,000) from Debtors and their clients' funds. Willoughby Declaration, ¶ 17.[3]

16.    The theft loss of not less $8,100,000 put the Debtors behind on a number of financial obligations. Willoughby Declaration, ¶ 18. Additionally, the Debtors notified their clients of the theft loss, causing a number of clients to terminate their relationships with the Debtors, which put further financial strain on the Debtors. *Id.*

17.    Debtors then advised their clients that Debtors would assist them in transitioning to other third-party administrators, which has been ongoing. Willoughby Declaration, ¶ 19. Debtors continued administering claims for clients while that transition process occurs. *Id.* If Debtors were to stop administering those claims prior to clients obtaining new third-party administrators, the employees of our clients, and the medical providers to whom they have assigned benefits, would not receive timely reimbursement for their medical care claims that the Debtors process. *Id.*

18.    On September 10, 2024, one of Debtors' clients – Ciena – filed a Complaint initiating a lawsuit (the "Ciena Lawsuit") in the United States District Court for the Eastern District of Michigan (the "Michigan District Court") against each of the affiliated Debtors. Willoughby Declaration, ¶ 20. The Ciena Lawsuit alleged that money had been misused and sought a temporary restraining order ("TRO"). *Id.*

19.    On September 11, 2024, the District Court entered a TRO, on an *ex parte* basis.

---

[3] The Debtors are investigating the full amount of the theft, and the retention of a forensic accountant to assist in that investigation is one subject of this Application.

Willoughby Declaration, ¶ 21.

20.    The affiliated bankruptcy cases were filed in order (i) to provide the affiliated Debtors with the ability and time to continue to administer health plans for their remaining clients, (ii) to assist those clients who are transitioning to different third-party administrators but who need additional time and assistance, (iii) to address the language of the TRO which caused concerns for the Debtors, (iv) to seek to sell lines of business that can be sold, and (v) to pursue the rights to recover from wrongdoers for the benefit of all claimants. Willoughby Declaration, ¶ 27.

21.    Since filing the affiliated bankruptcy cases, Debtors have communicated with several forensic accountants regarding an engagement to investigate the losses they suffered.

22.    Debtors have conferred with counsel for Ciena about the anticipated forensic accounting process in this affiliated Chapter 11 cases, and have offered to conduct a forensic accounting of Debtor's use of funds which would be transparent and independent. That includes (a) soliciting input from creditors, including Ciena, as to who will serve as the forensic accountant, (b) soliciting input from key participants regarding the scope of work, (c) providing transparency on what source materials – such as which bank accounts, what date range, etc. – are being reviewed, (d) agreeing, in advance, that the accountants will not be restricted by existing management as to source materials, scope of work, or scope of reporting, and (e) agreeing, in advance, that the resultant work product would be shared with key participants, including Ciena.

23.    With input from Ciena, the Debtors have selected B. Riley to provide the Debtors a Chief Restructuring Officer, in the form of Mr. Glade, and certain additional personnel. A copy of Mr. Glade's biography is attached hereto as **Exhibit "A"**.

24.    While the process of interviewing professionals, Mr. Willougby gave a deposition in the Ciena Lawsuit pending in the Michigan District Court. During his deposition, Mr.

5

Willoughby was asked numerous questions about the Debtors' medical claims processing. Mr. Willoughby invoked the Fifth Amendment right against self-incrimination in responses to a large number of those questions. A copy of excerpts from that deposition transcript is attached hereto as **Exhibit "B"**.

25.    Debtors' counsel, Ciena's counsel, and Mr. Willoughby, have conferred regarding this matter, and agree that retention of a CRO is warranted under the circumstances of this case. Debtors' counsel also provided advance notice, via email, to the United States Trustee on November 7, 2024, indicating that a motion to retain a CRO would be submitted, and provided a copy of Mr. Glade's biography.

26.    Retention of a CRO facilitates (a) the processing of remaining claims of clients of the Debtors, (b) the forensic investigation that Debtors had already been working toward prior to Mr. Willougby's deposition, (c) a fulsome investigation following Mr. Willoughby's deposition, (d) confirmation of a Plan through the efforts of the CRO.

## **RELIEF REQUESTED**

27.    By this Application, Debtors seek to retain B. Riley to provide Debtors a Chief Restructuring Officer, in the form of Mr. Glade, and certain additional personnel as needed effective as of November 4, 2024.

28.    Mr. Glade has an educational background and work experience that would assist Debtors in performing a forensic accounting of misappropriated funds, winding down their affairs, determining avenues for potential recoveries of funds, and to assist with formulating and confirming a Plan of Reorganization. Mr. Glade's Curriculum Vitae is attached hereto as **Exhibit "A"** and, amongst his relevant educational background and experience, shows:

a.  Mr. Glade graduated from the University of Georgia with a Bachelors of Business Administration in Accounting and a Masters of Accountancy.

b.  Mr. Glade is a Certified Public Accountant licensed in the State of Georgia.

c.  Mr. Glade began his career in the audit practice of Grant Thornton, where he was involved with planning, implementation, and conclusion of both large and small public and private audits.

d.  Mr. Glade has served as CRO for companies in the healthcare industry, and as such is familiar with the services provided by TPAs, such as the Debtors. Representative examples of Mr. Glade's experience serving as CRO or Receiver as included in **Exhibit "A"**.

29.     Among other things, as CRO, Mr. Glade has agreed to provide the following services to Debtors, as necessary and appropriate:

a.  Assisting Debtors in fulfilling their rights, duties and obligations as a debtor-in-possession;

b.  Reviewing claims filed in the case and assisting Debtors in evaluating such claims for potential objections;

c.  Attending and participating in examinations pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure as may be deemed desirable or necessary;

d.  Consulting with Debtors with respect to formulating a Chapter 11 plan of reorganization, and in the Chapter 11 plan confirmation process;

e.  Assisting Debtors with the preparation of monthly operating reports;

f.  Performing those services incidental and necessary to carrying out the day-to-day operations of Debtors' business activities;

g.  Assisting in the evaluation and prosecution of necessary adversary proceedings and contested matters; and

h.    Taking any and all other actions incident to the proper preservation and administration of Debtors' estate and business.

## TERMS OF PROPOSED ENGAGEMENT

30.    The time-keepers from B. Riley who might be expected to work on this case, and their corresponding hourly rates, are set forth in the Engagement Letter attached hereto as **Exhibit "C"**.

31.    B. Riley has requested a retainer in the amount of $50,000, which Debtors have agreed to provide, subject to approval by the Court. That retainer is reasonable under the circumstances, as Mr. Glade and B. Riley need to wind down ongoing operations, perform a forensic accounting, assist in formulation and confirmation of a plan of reorganization, and undertake other actions. *See* Declaration of Mr. Glade attached hereto as **Exhibit "D"**.

32.    The engagement agreement with B. Riley contains a request for indemnification of Mr. Glade and B. Riley for their services provided to Debtors and their estates, or a nature considered typical for a CRO engagement, and not extending indemnification for any willful misconduct.

33.    The engagement agreement does not provide for any success fee or similar fee enhancement based on results.

## BASIS FOR RELIEF – ARGUMENT AND CITATION OF AUTHORITIES

34.    Debtors have need to retain and employ a CRO in order to address issued raised by the invocation of the Fifth Amendment right against self-incrimination during Mr. Willoughby's deposition in the Ciena Lawsuit, as Mr. Willoughby is the only remaining officer of the Debtors.

35.    It is permissible for a debtor in Chapter 11 to alter its management structure and controlling persons during their bankruptcy case. *In re K.G. IM, LLC*, 620 B.R. 469, 482 (Bankr. S.D.N.Y. 2020) ("As an initial matter, the Debtors' rights under state law and the applicable

8

operating agreements to alter their management structure postpetition is an appropriate exercise of their governance rights and permissible under the Bankruptcy Code. Absent appointment of a chapter 11 trustee, those state law governance rights with respect to a Delaware LLC persist; and neither Delaware law nor the Bankruptcy Code gives the UST special rights to block the exercise or transfer of governance rights in the absence of appointment of a chapter 11 trustee."). The ability of a debtor in possession to alter its management extends to the debtor retaining a CRO. *Id.* at 482.

36.     A debtor in possession may appropriately delegate ultimate decision-making authority to a CRO. *Id.*

37.     Retention of a CRO may be authorized pursuant to Section 363 of the Bankruptcy Code. *In re K.G. IM, LLC*, 620 B.R. at 478 ("Debtors may retain estate professionals, including CROs, pursuant to section 363(b) of the Bankruptcy Code."). In this instance, such relief is proper as shown below.

**A. Retention of Mr. Glade and B. Riley is authorized by Section 363(b)&(h).**

38.     "Section 363(b) provides, in relevant part, that the trustee or debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate ...." 11 U.S.C. § 363(b). A debtor in possession has broad discretion to use estate property when such use represents a reasonable business judgment on the part of the debtor. *See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (noting that a debtor must show "some articulated business justification" for using property outside the ordinary course of business under section 363(b))." *In re K.G. IM, LLC*, 620 B.R. 469, 478 (Bankr. S.D.N.Y. 2020).[4]

---

[4]     While the J. Alix Protocol is sometimes applied when retention of a CRO is sought under Section 363, the Debtors and CRO need not comply with the J. Alix Protocol in this instance, as that protocol was designed to deal with situation in which a CRO had been employed *prior* to a

39.     When a debtor articulates a business judgment purpose for engaging a CRO, the Court may approve retention of the CRO pursuant to Section 363. *In re K.G. IM, LLC*, 620 B.R. at 487 ("The CRO Retention Application and the Debtors' Objection sets out sound business reasons for retaining [the CRO] ….the Court overrules the UST's objection and approves the CRO Retention Application pursuant to section 363(b) of the Bankruptcy Code.").

40.     In the cases at hand, the Debtors have articulated sound business reasons for retaining a CRO, including that Debtors continue to have some operations, a fulsome investigation of certain activities and transactions is necessary, and existing management may be a subject of parts of that investigation for which reasons an independent individual's involvement is required.

41.     Although the Debtors respectfully submit that the retention of B. Riley is not governed by section 327 of the Bankruptcy Code, Mr. Glade and B. Riley have determined that they do not hold an interest in the Debtors, or represent any other entity that has adverse interest in connection with Debtors' cases. *See* Declaration of Mr. Glade attached hereto as **Exhibit "D"**.

42.     Neither Mr. Glade, nor B. Riley, has represented any creditor of any of Debtors as far as is known.  *See* Declaration of Mr. Glade attached hereto.

43.     Neither Mr. Glade, nor B. Riley, has any business dealings with any creditor of any of Debtors so far as is known, other than as set forth in the Declaration of Mr. Glade. *See* Declaration of Mr. Glade attached hereto.

---

bankruptcy case, and thus might not be disinterested when the CRO continues to serve in that capacity post-petition. *In re K.G. IM, LLC*, 620 B.R. 469, 486 (Bankr. S.D.N.Y. 2020) ("The UST summarizes the J. Alix Protocol, which originated from a settlement agreement between the UST and Jay Alix & Associates, as describing the CRO as a hybrid, 'part professional advisor and part operational decision maker.' (*Id.* at 8.) The UST lauds the J. Alix Protocol as a 'reliable framework for the continued postpetition employment of a financial advisor' ***that had been employed with the debtor prepetition***, provided that the 'CRO fully meets the disclosure and retention standards under Section 327' of the Bankruptcy Code.") (emphasis supplied).

44.     Neither Mr. Glade, nor B. Riley, holds nor represents any interest materially adverse to Debtors, or Debtors' respective estates, and has had no dealings with Debtors' creditors, their counsel, or the U.S. Trustee, except as set forth in the Declaration of Mr. Glade. *See* Declaration of Mr. Glade attached hereto.

45.     In sum, as set forth in the Declaration of Mr. Glade, Mr. Glade and B. Riley are disinterested with respect to the Debtors and the Debtors' estates.

**B. Indemnification of Mr. Glade and B. Riley is appropriate.**

46.     As a material part of the consideration for which Mr. Glade and B. Riley have agreed to provide the services described herein, the Debtors have agreed to indemnify Mr. Glade and B. Riley under certain circumstances, as set forth in the engagement letter accompanying this application.

47.     Debtors believe that the proposed indemnification provisions are reasonable as CROs and their firms are typically hesitant to agree to serve without such provisions, and as the provisions exclude willful wrongdoing. *See* Declaration of Mr. Glade.

48.     The indemnification provisions are reasonable under the circumstances and reflect market conditions, and accordingly should be approved. *See, e.g., In re United Artists Theatre Co. v. Walton*, No. 01-1351, 315 F.3d 217 (3rd Cir. 2003) (approving indemnification for investment banker and financial advisor where the indemnity clause, including a carve out for gross negligence, was "reasonable" and, therefore, permissible under the Bankruptcy Code).

<u>**CONCLUSION**</u>

Employment and retention of B. Riley and the designation of Mr. Glade as CRO are appropriate for the reasons given herein. The Court may appoint a CRO without an evidentiary

hearing regarding the CRO exercising authority of the Debtors in this context, as the Debtors are seeking that retention.

Subject to this Court's approval of the relief requested, Debtors request that Mr. Marshall and B. Riley be compensated on an hourly basis, and be reimbursed for the actual and necessary expenses that the Firm incurs, in accordance with the ordinary and customary rates which are in effect on the date the services are rendered, without the need to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code. Mr. Marshall and B. Riley will, however, file with the Court and provide reports of fees earned, expenses incurred, and time spent by each of the timekeepers who work on Debtors' respective cases during the applicable time period with service to the Debtors, the Office of the United States Trustee for the Northern District of Georgia and counsel to any statutory committee appointed in the Debtors' cases, if any.

WHEREFORE, Debtors request that this Court enter an Order:

(i)     authorizing Debtors to employ B. Riley and designating Mr. Glade their CRO pursuant to section 363 of the Bankruptcy Code,

(ii)    finding that Mr. Marshall and B. Riley are "disinterested" and do "not hold or represent an interest adverse to the estate" within the meaning of Section 327 (to the extent applicable) of the Bankruptcy Code, and

(iii)   providing such other relief as the Court deems proper and just.

This 13th day of November, 2024.

Respectfully Submitted,

ROBL LAW GROUP, LLC

*/s/ Michael D. Robl*
Michael D. Robl
Georgia Bar No. 610905
michael@roblgroup.com

12

Maxwell W. Bowen
Georgia Bar No. 719784
max@roblgroup.com

3754 Lavista Road, Suite 250
Tucker, Georgia 30084
(404) 373-5153 (telephone)
(404) 537-1761 (facsimile)
*Proposed counsel for Debtor*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re: | Case No. 24-59671-SMS |
| GROUP RESOURCES ACQUISITIONS, LLC, *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

## CERTIFICATE OF SERVICE

I hereby certify that I am served the foregoing using the Bankruptcy Court's ECF/CM system, which sends electronic notice to all parties having appeared in this case who are registered with the ECF/CM system, including the United States Trustee.

This 13th day of November, 2024.

ROBL LAW GROUP, LLC

*/s/ Michael D. Robl*
Michael D. Robl
Georgia Bar No. 610905

---

[1] The following cases are being jointly administered with Group Resources Acquisitions, LLC: Employee Benefit Concepts, Inc. (24-59673-SMS); Group Resources of Iowa, LLC (24-59675-SMS); and Group Resources Incorporated (24-59729-SMS).

# EXHIBIT "A"

[Biography of Marshall Glade]

# MARSHALL GLADE CPA

## MANAGING DIRECTOR

mglade@brileyfin.com

(470) 346-6842

vCard



### Prominent Matters

- Selected as Chief Restructuring Officer (and subsequently Liquidating Trustee) for Camp-bellton-Graceville Hospital, a critical access hospital located in the Florida panhandle

- Named as the Chief Restructuring Officer for Regional Health Properties, a 30-facility publicly traded Skilled Nursing Facility REIT (NYSE: RHE)

- Appointed Chief Restructuring Officer in the IFS Securities, a broker-dealer, Bankruptcy

- Appointed Receiver and selected as Chief Restructuring Officer of Virtual Citadel and VC Mining – a real estate owner, data center and bitcoin mining operation

- Appointed Receiver of the Unity Health Care Sharing Ministry plan assets during the pendency of their litigation with Aliera Healthcare, Inc. in the Business Case Division of the State of Georgia

- Appointed Liquidating Trustee in the IFS Securities broker-dealer bankruptcy

- Appointed Liquidating Trustee in the West Paces Development bankruptcy, a mixed-use land development

- Engaged as Financial Advisor to the liquidating trustee in the Fairfield Residential bankruptcy, a 180 property multi-family owner and developer

**Specialties:**

Fiduciary Roles

Bankruptcy Proceedings

Borrower & Lender Advisory

Chief Restructuring Officer

Due Diligence

Financial Advisor

M&A

Forensic Accounting

Turnarounds / Restructurings

**Industries:**

Financial Institution

Real Estate

Healthcare

Hotels & Resorts

Technology

Marshall Glade, CPA, is a Managing Director with over 17 years of experience advising clients ranging from small startups to Fortune 500. Since joining GlassRatner (now doing business as B. Riley Advisory Services), Marshall has worked in corporate finance and restructuring. He has been appointed in a number of fiduciary type roles such as Receiver and Liquidating Trustee. Additionally, he has advised companies through out-of-court restructurings, formal bankruptcy proceedings, formal sales processes, pre-acquisition due diligence, forensic accounting investigations, complex valuations and liquidation and trustee advisory work. He has experience in a number of industries, including healthcare, real estate, software, banking and transportation.

Marshall has worked in a number of interim management roles including Chief Restructuring Officer and Chief Financial Officer. He has served as financial advisor to debtors, unsecured creditor committees and chapter 11 Trustees. Additionally, Marshall has been appointed as a Liquidating Trustee.

In 2017, Marshall received the Commercial Finance Association's (CFA) 40 Under 40 Award for his exemplary work in the Bankruptcy/Restructuring realm. Marshall has published articles in both the Secured Lender and Financier Magazine.

Marshall began his career in the audit practice of Grant Thornton, where he was involved with planning, implementation, and conclusion of both large and small public and private audits.

Marshall graduated from the University of Georgia with a Bachelors of Business Administration in Accounting and a Masters of Accountancy. He is a Certified Public Accountant licensed in the State of Georgia.

**B RILEY** *Advisory Services*

a B. Riley Financial company

# EXHIBIT "B"

[Excerpts from Deposition Transcript of Mr. Willoughby]

```
1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF MICHIGAN

3                        SOUTHERN DIVISION

4

5    CIENA HEALTHCARE MANAGEMENT,

6    INC., et al,

7         Plaintiffs,

8

9         -vs-                    Case No. 2:24-CV-12362-MAG-DRG

10

11   GROUP RESOURCES INCORPORATED,

12   et al,

13        Defendants.

14   _____/

15

16

17        DEPONENT:  WILLIAM ANDREW WILLOUGHBY - VOLUME 2

18        DATE:      Tuesday, October 22, 2024

19        TIME:      10:45 a.m.

20        LOCATION:  CLARK HILL, PLC

21                   500 Woodward Avenue, Suite 3500

22                   Detroit, Michigan

23        REPORTER:  Karen Fortna, CRR/RMR/RPR/CSR-5067

24        JOB NO:    34356

25
```

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
181..184

---

Page 181

1  A.   Not that I recall.
2  Q.   And you have a copy of that letter somewhere?
3  A.   Yes, sir, as does counsel.
4  Q.   And then what is the other -- who are the other
5       clients who've indicated they are considering legal
6       action or however you put it?
7  A.   I don't recall specifically.
8  Q.   How many?
9  A.   Three or four.
10 Q.   Can you name any of them?
11 A.   No, sir, I cannot.
12 Q.   Who could?
13 A.   I don't know that anyone could name it at the
14      moment.
15 Q.   Well, who was involved in the -- but you had -- if
16      you looked in your records and emails, you would be
17      able to name them?
18 A.   Yes, sir, possibly.
19 Q.   Do you know the combined amount of those potential
20      disputes?
21 A.   Not without knowing the companies; no, sir.
22 Q.   What's the highest -- after Ciena, what's the
23      highest number that you're aware of that may be in
24      dispute that these clients may have been claiming?
25 A.   I don't recall specifically.

---

Page 182

1  Q.   Okay. How about generally, can you give me an
2       estimate?
3  A.   I don't have an estimate.
4  Q.   Has anyone claimed -- other than Ciena, has anyone
5       claimed over seven figures?
6           MS. REAGAN:  Object to form.
7           THE WITNESS:  No, sir, no one has claimed
8       anything other than Rovin.
9  BY MR. WILHELM:
10 Q.   Okay. Other than Ciena?
11 A.   Other than Ciena; yes, sir.
12 Q.   Have any of these clients asked you for
13      information?
14          MS. REAGAN:  Object to form.
15          THE WITNESS:  In what regard?
16          MR. WILHELM:  To like investigate,
17      asking -- like, "We're looking into some stuff and
18      we're asking for information from you."
19          MS. REAGAN:  Object to form.
20          MR. WILHELM:  I'm paraphrasing, but
21      anything --
22          THE WITNESS:  Not asking anything in that
23      reference. I've provided information relating to
24      claims paid and accumulators so they can transition
25      to the new administrator and provide a report, but

---

Page 183

1       in reference to the rest, no, sir.
2  BY MR. WILHELM:
3  Q.   In connection with your bankruptcy and I think in
4       other submissions -- I'm paraphrasing -- but is it
5       fair to say you did an investigation or you were
6       involved in an investigation about Obermeyer's
7       conduct in which you have said there's a claim
8       against Obermeyer from the Group Resources group of
9       at least 8.1 million?
10          MS. REAGAN:  Object to form.
11          THE WITNESS:  Yes, sir; that's correct.
12 BY MR. WILHELM:
13 Q.   All right. And have you done -- that's what you
14      said at least as of mid September. Has that number
15      changed from your perspective or been more -- do
16      you have a more precise number now?
17 A.   No more precise. It has not significantly changed.
18 Q.   Okay. Has anyone -- to your knowledge, have you
19      done an assessment of how much money was taken from
20      Ciena?
21 A.   No, sir.
22 Q.   To your knowledge, have you done an assessment or
23      anyone at Group Resources done an assessment on
24      how much remains in unpaid claims for the Ciena
25      plan?

---

Page 184

1           MS. REAGAN:  I'm going to object to form
2       and foundation and instruct the witness not to
3       answer and assert the Fifth Amendment privilege.
4           THE WITNESS:  Based on advice of counsel
5       and a pending investigation, I'm going to exercise
6       my Fifth Amendment right to not answer that
7       question.
8           MR. WILHELM:  I'm just asking if you have
9       done an assessment of the amount of unpaid claims
10      on the Ciena claim.
11          MS. REAGAN:  Same objection. Same
12      instruction.
13          MR. WILHELM:  You're invoking the Fifth
14      Amendment on that? The witness is invoking the
15      Fifth Amendment on that question?
16          THE WITNESS:  Based on the advice of
17      counsel and the pending investigation, I'm invoking
18      my right under the Fifth Amendment to not answer
19      that question.
20 BY MR. WILHELM:
21 Q.   What pending investigation?
22 A.   Based on a conversation with the FBI, I cannot have
23      further discussions about that investigation.
24 Q.   A conversation that who had with the FBI?
25          MS. REAGAN:  Object to form. Do you

---

Page 185

1    understand the question?
2         THE WITNESS: I don't understand the
3    question. I'm sorry.
4  BY MR. WILHELM:
5  Q.   You said, "Based on a conversation with the FBI."
6    I'm asking, who was part of this conversation with
7    the FBI?
8  A.   It was a counsel conversation.
9  Q.   I'm not clear on what you're telling me. Did you
10   speak to the FBI?
11 A.   Not directly. Through counsel.
12 Q.   You had your counsel interface with them?
13 A.   Yes, counsel has interfaced with them.
14 Q.   Which counsel, please?
15 A.   Bruce Morris.
16 Q.   And who is that?
17 A.   Another of our attorneys.
18 Q.   Who referred you to Bruce Morris?
19 A.   Phil Weener.
20 Q.   There was some discussion of getting a list from
21   you of all claims received by Group Resources or
22   EBC on the Ciena plan over time, whether or not
23   they were in fact paid or a check allegedly issued.
24   Are you familiar with that query?
25 A.   Yes, sir.

Page 186

1  Q.   Why have you not provided that yet?
2  A.   We have responded to that request with the checks
3    that had been written.
4  Q.   You've given a response of checks allegedly
5    written, but my question is not about that, it's
6    about the records that would show all claims in
7    fact received by Group Resources in the first
8    place. Why have you not provided those records?
9  A.   There is no record that differs from the paid
10   claims history and pending claims.
11 Q.   What happened to the records?
12 A.   There is no record.
13 Q.   Are you saying that -- is it your testimony here
14   today that every claim that was ever received
15   actually got paid?
16 A.   Every claim that was received would have been
17   adjudicated and on a check run or be in process.
18 Q.   So the ones that are in process and on which a
19   check was not run, where is that list?
20 A.   A pending claim list was provided to Ciena in
21   September of those pending claims. Anything else
22   are claims that are in process, received since that
23   date.
24 Q.   What about a list -- what about records of claims
25   actually received? So this would be whether

Page 187

1    they're paper, electronic. You all must have
2    records of the claims in fact received at any time
3    since you started working with Ciena. Who would
4    have those records?
5  A.   There is not a log of claims received.
6  Q.   I didn't ask about a log, I asked about the
7    records. Who would have those records?
8  A.   The records are in the claims detail. I mean,
9    there's no other record.
10 Q.   I'm not sure I'm understanding what you're saying,
11   but when a paper record comes in, if there is any,
12   where does that paper go?
13 A.   It goes into the queue for the examiner to process.
14 Q.   Okay. But the paper remains in electronic storage?
15 A.   As they're adjudicated, they are stored
16   electronically; yes, sir.
17 Q.   Okay. So that would be -- and what if it's not
18   been adjudicated yet and it's just sitting there?
19 A.   It would be in a physical stack of paper to be
20   adjudicated.
21 Q.   Okay. So that's what I'm asking about. The
22   physical stacks of paper, pre-adjudication,
23   current, pending that have not yet been paid or
24   ones that need to be reprocessed and are still in
25   the queue, where would we get all those records?

Page 188

1  A.   The pending claims have been provided. There is no
2    log or detail record of the claims that are in the
3    stacks to be processed.
4  Q.   All right. So where do we get the stacks?
5  A.   They're physically present in the Duluth office.
6  Q.   Okay. Have they been shredded yet?
7  A.   No, sir.
8  Q.   Okay. Because I know you were shredding some
9    documents. So they're still in the physical form
10   then, you would say?
11        MS. REAGAN: Object to form.
12        MR. WILHELM: They're still in physical
13   paper form?
14        MS. REAGAN: Object to form.
15   Argumentative. Move to strike the testimony of
16   counsel that he was shredding papers.
17        THE WITNESS: Unadjudicated claims reside
18   in paper form.
19 BY MR. WILHELM:
20 Q.   Okay. And has anyone done an assessment of how
21   many are unadjudicated claims?
22 A.   No, sir.
23 Q.   Would you all be able to do that assessment and get
24   me the results this week along with all the
25   records?

Case 24-59671-sms Doc 42 Filed 11/13/24 Entered 11/13/24 18:47:19 Desc Main
Document Page 21 of 79

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
189..192

**Page 189**

1 A.  What records?
2 Q.  All the unadjudicated claims.
3 A.  Are you asking -- are you asking for copies of
4      those claims when you say "records"?
5 Q.  All documents and records that would reflect all
6      unadjudicated claims.  And would you also be able
7      to do an investigation to determine the number and
8      the amount of all?
9 A.  Claims received through a certain date, whatever
10     date that was, two days ago, three days ago, that
11     have been opened and repriced would be in a stack
12     that they can be accounted for; yes, sir.
13 Q.  I'm talking about all in history that have not been
14     yet adjudicated and that are -- that have not been
15     paid.
16 A.  Paid is a different word.  Adjudicated, I can
17     answer the question.  Adjudicated is a claim that
18     we have processed.  So claims that are unprocessed,
19     unadjudicated would be those claims that are still
20     in the queue to be processed, new receipts, along
21     with claims that have been pended for additional
22     information.
23 Q.  Yes.  So seeking all that information, how soon can
24     you get us that?  Can you get us all that this
25     week?

**Page 190**

1       MS. REAGAN:  Object to form.
2       THE WITNESS:  We have limited staff.  We
3      can do our best to get it to you this week; yes,
4      sir.
5 BY MR. WILHELM:
6 Q.  All right.  And how about doing an assessment of
7      the unpaid claims on the Ciena plan account -- off
8      of the Ciena plan?
9       MS. REAGAN:  Object to form.
10      MR. WILHELM:  All unpaid claims for
11     whatever reason.
12      MS. REAGAN:  Object to form.  Are you
13     asking for records of all the unpaid claims?
14      MR. WILHELM:  Yes.
15      THE WITNESS:  I don't know that we have a
16     clear record of the unpaid claims.
17 BY MR. WILHELM:
18 Q.  All right.  And I asked you earlier, have you done
19     an assessment on Ciena unpaid claims and you
20     invoked the Fifth Amendment, so I don't want to ask
21     you to re -- I'm not trying to get around that, but
22     will you commit to do an assessment of the unpaid
23     claims relating to the Ciena plan?
24      MS. REAGAN:  Object to form.  I'm not
25     sure what you mean by "assessment."

**Page 191**

1       THE WITNESS:  I'm unclear what's being
2      asked, also.  I'm sorry.
3 BY MR. WILHELM:
4 Q.  Will you do an investigation to determine, from
5      your perspective, the total amount of claims that
6      have not been paid?
7       MS. REAGAN:  Object to form.  Paid by
8      whom?
9       MR. WILHELM:  Go ahead, if you know.
10      THE WITNESS:  I can give you an answer
11     related to unadjudicated claims, claims that are in
12     process.  That report, I can make copies and get;
13     the other, I don't know.
14 BY MR. WILHELM:
15 Q.  How about claims you would say have been
16     adjudicated, but in fact that still haven't been --
17      MS. MORGAN:  I'm going to object to that
18     question and any line of questioning that is Andy
19     Willoughby to search and create a summary from raw
20     data.  We've produced the raw data for the
21     adjudicated claims, I believe he's already
22     committed to searching for the paper files for the
23     unadjudicated claims, but under Cardenas versus
24     DB Industries, et al, a moving party is not
25     required -- excuse me.  A party is not required to

**Page 192**

1 summarize documents to the opposing party.  The
2 burden is on --
3       THE REPORTER:  I'm sorry, you have to
4 slow down for me.
5       MS. REAGAN:  We've got a court reporter
6 here, Renee.
7       MS. MORGAN:  Apologies.  Let me know when
8 you're ready.
9       THE REPORTER:  I'm ready.
10      MS. MORGAN:  Okay.  My objection is based
11 on Cardenas versus DB Industries and it relates
12 to --
13      MR. WILHELM:  Counsel, this is not a
14 proper --
15      MS. MORGAN:  -- in discovery and how a
16 party is not required to summarize documents.
17      MR. WILHELM:  Counsel, I'm going to tell
18 you right now that this is not a proper objection
19 to a line of questioning.  Your witness has the
20 right to do whatever he wants.  You can tell him --
21 you can tell him to refuse to answer or refuse to
22 cooperate with RPDs that have been court ordered in
23 the way you wish to refuse to cooperate, but the
24 witness has the right to cooperate if he wants to
25 and you're not allowed to coach him and it's an

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                              193..196

Page 193

1    improper objection.
2          You're not objecting based on privilege,
3    you're not objecting based on trade secrets.  It's
4    totally improper and it's a speaking objection that
5    needs to be stricken and disregarded.  The witness
6    can answer.
7          MS. MORGAN:  I appreciate your input,
8    however my objection still stands.  You're asking a
9    party to do something that they are not required to
10   do under federal law and my objection stands.
11   Thank you.  You may proceed to continue asking
12   questions.
13         If you continue to ask him the same thing
14   in questions, I will continue to reiterate.  I'll
15   just say "Same objection as before," that a party
16   has no duty to create a summary for another party
17   that may have --
18         MR. WILHELM:  Counsel, your speaking --
19         MS. MORGAN:  -- when they have produced
20   the raw data.
21         MR. WILHELM:  Counsel, your speaking
22   objections are improper.
23   BY MR. WILHELM:
24   Q.   Mr. Willoughby, I asked you earlier and I'm
25        summarizing, but have you all done an investigation

Page 194

1    into the amount of unpaid claims on the Ciena plan?
2          MS. REAGAN:  Object to form and also
3    instruct the client to invoke his Fifth Amendment
4    right.
5          **THE WITNESS:  Based on the advice of**
6    **counsel and a pending investigation, I'm exercising**
7    **my right under the Fifth Amendment to not answer**
8    **the question.**
9    BY MR. WILHELM:
10   Q.   Will you do such an investigation?
11         MS. REAGAN:  Object to form.  Foundation.
12         **THE WITNESS:  I cannot commit to that at**
13   **this time.**
14   BY MR. WILHELM:
15   Q.   Why not?
16         MS. REAGAN:  Object to form.  I'm just
17   going to say it's unclear exactly what you're
18   asking the witness to do.  Are you asking the
19   witness to provide documents and records?
20         MR. WILHELM:  Counsel, I'm asking -- the
21   question speaks for itself and I'll ask it again.
22         MS. REAGAN:  Well, it doesn't speak for
23   itself, Paul, and I'm not going to have a client
24   commit to something that is literally impossible
25   for him to do.

Page 195

1    BY MR. WILHELM:
2    Q.   Will Group Resources or you commit to doing an
3         investigation on all unpaid claims on the Ciena
4         plan?
5          MS. REAGAN:  Object to form.
6          MS. MORGAN:  Object to form.  Same
7    objection as previously stated.
8          MR. WILHELM:  Go ahead.
9          **THE WITNESS:  No.**
10   BY MR. WILHELM:
11   Q.   Why not?
12   A.   **At this time we're not able to provide that.**
13   Q.   It's more about willingness or -- I asked you would
14        you be willing to and you said no and now you're
15        saying you're not able to.  Which is it?
16   A.   **It's both.**
17   Q.   You're neither willing or able?
18   A.   **Not willing at this time based on advice of**
19        **counsel.**
20   Q.   All right.  And then able.  What's your basis for
21        saying able?  You don't have enough staff?
22   A.   **Time limits and staffing, yes.**
23   Q.   What's your -- are you under some time pressure?
24         MS. REAGAN:  Object to form.
25   Argumentative.

Page 196

1    BY MR. WILHELM:
2    Q.   Do you have plans to resign from Group Resources at
3         the end of the month?
4          MS. REAGAN:  Object to form.
5    Argumentative.
6          **THE WITNESS:  No, sir, I do not.**
7    BY MR. WILHELM:
8    Q.   What's the time issue that you're mentioning?
9    A.   **There are many issues going on with shutting down**
10        **the operations, winding down the operations.**
11   Q.   So you're busy winding up operations while you have
12        two injunctions against you and are subject to
13        expedited discovery and a preliminary injunction,
14        so --
15         MS. REAGAN:  Object to form.
16         MR. WILHELM:  -- you kind of can't be
17   bothered; is that the idea?
18         MS. REAGAN:  Object to form.
19   Argumentative.  I don't know if there's a question
20   there.
21         **THE WITNESS:  Was there a question?**
22   MR. WILHELM:  Is that the idea?
23   **THE WITNESS:  What the idea?**
24   MR. WILHELM:  That you can't be bothered.
25   MS. REAGAN:  Object to form.

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                         197..200

---

Page 197

1    Argumentative. Misstates the witness's testimony.
2         THE WITNESS: No, it's a function of how
3    many hours are available in any given period to get
4    things accomplished.
5    BY MR. WILHELM:
6    Q.   Okay. Well, if that's the case, how much time do
7    you need?
8         MS. REAGAN: Object to form.
9         THE WITNESS: I do not know.
10   BY MR. WILHELM:
11   Q.   Would you look at that and get back to us?
12        MS. REAGAN: Object to counsel.
13        MR. WILHELM: Through your counsel.
14        MS. REAGAN: Paul, do you want to --
15        MR. WILHELM: You can't interrupt the
16   witness. You can't --
17        MS. REAGAN: I'm not trying to interrupt.
18        MR. WILHELM: Don't make a speaking
19   objection, counsel.
20        MS. REAGAN: I'm objecting because it's
21   unclear to me specifically what you're asking for,
22   the scope, the time period, the types of documents,
23   the information --
24        MR. WILHELM: Counsel, that's an improper
25   speaking objection. I'm sorry.

---

Page 198

1         I just asked, will you get back to us
2    through your counsel, sir, on that front?
3         THE WITNESS: I will discuss it with
4    counsel.
5         MR. WILHELM: Have your counsel get back
6    to us then one way or another, okay?
7         THE WITNESS: We'll discuss.
8         MS. REAGAN: We'll get back to you.
9         MR. WILHELM: Thank you.
10   BY MR. WILHELM:
11   Q.   In your affidavit, sworn declaration, I call it, I
12   think that's why I call it, you indicate in
13   paragraph 16, which is on page 10 of 20 of that ECF
14   filing, docket 7, September 19, 2024, is the date
15   of the filing. At the end it says you signed it on
16   September 17, 2024.
17        So I'm going to paragraph 16 of that
18   document, page 4. Do you see that, sir?
19   A.   Yes, sir.
20   Q.   It says, "In addition to taking client funds,
21   Mr. Obermeyer also took debtors' revenues for
22   himself." And also paragraph 15, right above that,
23   "Mr. Obermeyer's embezzlement involved taking
24   client funds from debtors and their clients,
25   putting those funds in GRA and GR Iowa accounts" --

---

Page 199

1    A.   Where are you? I'm sorry.
2    Q.   Paragraph 15. "...and then using those GRA and GR
3    Iowa accounts to withdraw funds in cash," et
4    cetera, et cetera. Do you see that?
5    A.   Yes, sir.
6    Q.   Have you all done an assessment of how much in
7    client funds were stolen?
8    A.   No, sir.
9    Q.   Have you done an assessment of how much of Ciena
10   plan funds were stolen?
11        MS. REAGAN: Object to form. I'm going
12   to instruct the witness not to answer on the basis
13   of the Fifth Amendment.
14        THE WITNESS: On the advice of counsel
15   and based on a pending investigation, I'm
16   exercising my right under the Fifth Amendment to
17   not answer the question.
18        MR. WILHELM: I'm just asking if you've
19   done an investigation into it.
20        MS. REAGAN: Same objection. Same
21   instruction.
22        MR. WILHELM: You're refusing to answer
23   under the Fifth Amendment?
24        THE WITNESS: On the advice of counsel,
25   based on a pending investigation, I'm exercising my

---

Page 200

1    right under the Fifth Amendment to not answer that
2    question.
3    BY MR. WILHELM:
4    Q.   Do you know what other clients were stolen from
5    other than Ciena?
6         MS. REAGAN: Object to form.
7    Foundation.
8         MR. WILHELM: Because it says
9    "clients," plural. Do you know which ones
10   other than Ciena?
11        THE WITNESS: Not -- not by name.
12   BY MR. WILHELM:
13   Q.   How many?
14   A.   I would estimate 10 to 15.
15   Q.   And of that 10 to 15, what percentage was stolen
16   from Ciena?
17   A.   I do not know.
18   Q.   You're not sure?
19   A.   No, sir; I'm not.
20   Q.   If your bankruptcy counsel indicated that he
21   thought maybe half of it was Ciena, would you have
22   any reason to disbelieve that?
23        MS. REAGAN: Object to form. Asked and
24   answered.
25        THE WITNESS: I do not know.

---

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                        201..204

Page 201

1 BY MR. WILHELM:
2 Q.   You don't have any reason to disbelieve that or you
3       don't know whether he said that; what is your
4       testimony, sir?
5 A.   I wouldn't have a reason to disbelieve that.
6 Q.   Okay.
7 A.   But I don't know that that's the number.
8 Q.   What number do you think it is?
9 A.   I do not know.
10 Q.  You haven't bothered to try to find out?
11 A.  Rude.
12        MS. REAGAN:  Object to form.
13      Argumentative.
14        MR. WILHELM:  Sir, you're subject to a
15      federal lawsuit claiming millions in stolen assets
16      from an ERISA benefit plan and you haven't bothered
17      to try to find out what your alleged partner and
18      CFO did under your watch and you find my asking you
19      that rude?
20        MS. REAGAN:  Object to form.
21      Argumentative.  Intimidating and harassing --
22        MR. WILHELM:  I think you should check
23      yourself, sir.
24        THE WITNESS:  It was not the asking that
25      was rude, it was the characterization that was

Page 202

1       rude.  That's why I said rude.
2 BY MR. WILHELM:
3 Q.   So why haven't you looked into how much money was
4       stolen from the Ciena plan?
5        MS. REAGAN:  Object to form.  I'm going
6      to instruct the witness not to answer based upon
7      the Fifth.
8        THE WITNESS:  Based on advice of counsel
9      and a pending investigation, I'm exercising my
10     right to not answer that question under the Fifth
11     Amendment.
12 BY MR. WILHELM:
13 Q.  We received a number of texts in this case between
14     yourself and Mr. Obermeyer and I asked you about
15     some of those at your October 1st deposition.  I
16     wanted to share with you an excerpt from one to see
17     if you agree with the statement.
18        On July 3rd, you sent a text to Obermeyer
19     and I believe Janie Jackson and possibly another
20     person.  "Ladies, some good news for the holiday"
21     -- July 3, 2024.  "Intact has approved a payment of
22     200,000 while they continue their
23     investigation/determination."  Does that sound
24     right to you, that that was around the time you
25     learned that the 200,000 had been approved?

Page 203

1 A.   It would not have been with Dave Obermeyer as you
2      said.
3 Q.   I'm sorry?
4 A.   You said it was with David Obermeyer and Janie
5      Jackson.
6 Q.   Maybe it wasn't with Obermeyer, but Janie Jackson
7      and yourself and maybe Sheila Autry.  So I may need
8      to correct what I said.  This may not have been
9      from you.
10 A.  I can guarantee there was no conversation with
11     Obermeyer in July.
12 Q.  Okay.  Well, let me sort of reset the table on this
13     text because it may have been produced by
14     Ms. Autry, so any confusion is my fault on that.
15        All right.  So back to the question,
16     though.  You sharing that information with
17     Ms. Autry and Ms. Janie Jackson, does that sound
18     like around the right time, July 3, 2024, where you
19     learned about the 200?
20 A.  To be honest, I stopped listening when you said
21     Dave Obermeyer, so if you can repeat the question.
22 Q.  Did you learn about the payment of 200,000 around
23     July 3rd of this year?
24 A.  Based on that; yes, sir.
25 Q.  You have no reason to dispute that that was the

Page 204

1      time at least that you sent that text?
2 A.   No, sir, I do not.
3 Q.   All right.  And then Ms. Autry sent a response,
4      "Honestly, I think this is big.  They would have
5      never fronted one cent if this was to be denied.  I
6      think this is a sign of more to come.  I am
7      claiming 2 million."
8        And then you responded, "It will not be
9      2 million.  They are very clear there is no
10     coverage for client funds."
11        Do you see that?
12 A.  I don't see it.  You have it in front of you.
13 Q.  Sorry.  Well, do you recall sending that?
14 A.  Not specifically.
15 Q.  Okay.  Do you believe that to be a true statement
16     that with that crime policy, there's no -- the
17     insurance company took the position there is no
18     coverage for client funds?
19        MS. REAGAN:  Object to form.  Foundation.
20        THE WITNESS:  What was the question at
21     the end of that?  I'm sorry.
22 BY MR. WILHELM:
23 Q.  Do you agree that the insurance company took the
24     position that there is no coverage for client
25     funds?

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024    205..208

Page 205

1  A.    Yes, sir.
2  Q.    Client funds having been stolen is what I mean,
3        right?
4  A.    There was no coverage for theft of employer funds
5        under that policy according to the carrier.
6  Q.    And then she sent -- and then you said, "So we'll
7        have to prove that he stole more than 1.33 million
8        of GR funds."  What did you mean by -- do you
9        know why you wrote 1.33 million and not
10        1 million?
11            MS. REAGAN:  Object to form.  I'll note
12        for the record that Mr. Wilhelm is reading from a
13        document that is not in front of the witness.
14            THE WITNESS:  I don't recall the reason
15        for that.
16  BY MR. WILHELM:
17  Q.    But the payout was only a million, correct?
18  A.    Yes, sir.
19  Q.    And then she sent you a text, "Well, he did, didn't
20        he?  What about Jamaica and IPL?  Our admin would
21        have been too much for him to resist."  What did
22        she mean by that?
23            MS. REAGAN:  Object to form.  Foundation.
24            THE WITNESS:  I don't know what she would
25        have meant by that; I'm sorry.

Page 206

1  BY MR. WILHELM:
2  Q.    And then you responded to her, "I think he did.
3        I'll have to prove that to them, that we would have
4        had that as revenue after pass-through."  Is that
5        your -- is that accurate?
6            MS. REAGAN:  Object to form.
7            MR. WILHELM:  Is that accurate in terms
8        of what you said to her?
9            MS. REAGAN:  Foundation.  The witness
10        does not have the document in front of him to be
11        able to state whether it's written accurately or
12        not.
13            THE WITNESS:  Assuming that's what was
14        written, then yes, sir, that's accurate.
15  BY MR. WILHELM:
16  Q.    What is IPL?
17  A.    Innovative Partners.
18  Q.    And when Ms. Autry said, "Our admin would have been
19        too much for him to resist," what did she mean by
20        that?
21  A.    I can't speak as to what she meant.
22  Q.    Who was your admin associated with Jamaica and/or
23        IPL?
24            MS. REAGAN:  Object to form.
25            THE WITNESS:  There was no admin.

Page 207

1        Likely administration fees would make sense in
2        that context.
3  BY MR. WILHELM:
4  Q.    Were you involved in a mediation around June 19,
5        2024?
6            MS. REAGAN:  Object to form.
7            THE WITNESS:  It's possible.
8            MR. WILHELM:  And I'll get you the -- if
9        I'm able, I'll get you these texts, but you
10        indicated to somebody -- and I'll show you without
11        making this an exhibit -- a text with -- well,
12        sorry.  Let's go back to Ms. Autry's texts.  They
13        may be in there.  This will save some clumsiness.
14        And I apologize for delaying in that regard.
15        Go to June 19, please.
16            THE WITNESS:  Okay.
17            MR. WILHELM:  Of this year.
18            THE WITNESS:  Okay.
19            MR. WILHELM:  So we're in this exhibit --
20        which is the exhibit number, please?
21            MS. REAGAN:  Nine.
22            MR. WILHELM:  Nine.  Thank you.
23  BY MR. WILHELM:
24  Q.    Exhibit 9, we're at June 19, 2024, toward the
25        bottom.  You sent Ms. Autry something where you

Page 208

1        indicated, "FYI."  She says, "Thanks.  You okay?"
2            You respond, "Yes.  The IP folks refused
3        to join a common Zoom session so there's a lot of
4        waiting."
5            And then two lines up, you said, "I think
6        so.  They also told the mediator they didn't want
7        to hear the facts we repudiated their allegations
8        with."
9            Do you recall what this was about?
10  A.    Yes, sir.  It was a mediation with Innovative
11        Partners.
12  Q.    Is that the same entity that we just discussed?
13  A.    Yes, sir.
14  Q.    All right.  And what was the mediation concerning?
15  A.    It was over unpaid admin fees owed to us.
16  Q.    Owed to you?  You made a claim against them?
17  A.    Yes, sir.
18  Q.    All right.  And what was the result of that
19        mediation?
20  A.    There was a settlement agreed to.
21  Q.    And in that settlement, were they paying you or you
22        paying them?
23  A.    They paid us.
24  Q.    Okay.  Are you able to tell me how much?
25  A.    It was less than $15,000.

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                  Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                      209..212

Page 209

1 Q.   All right.  So it was a small situation --
2 A.   Yes.
3 Q.   -- as things go.
4           Now was Phil Weener representing you in
5      that mediation?
6 A.   Someone from Weener Nathan was; yes, sir.
7 Q.   Possibly him?
8 A.   I don't recall.
9 Q.   Who introduced you to the Weener Nathan Phillips
10     law firm initially?
11 A.  Tom Byrd.
12 Q.  They'd been his lawyers for many years?
13 A.  I don't believe so.
14 Q.  But when he was head of Group Resources before you
15     bought in -- using that term loosely -- was he
16     using Weener Nathan Phillips?
17 A.  Weener Nathan at that point became our corporate
18     lawyers -- at some point.
19 Q.  And he had used them for years prior to that?
20 A.  I don't know if he used them --
21         MS. REAGAN:  Objection.
22         THE WITNESS:  -- outside Group Resources.
23     I don't know that he had.
24 BY MR. WILHELM:
25 Q.  Through Group Resources for years?

Page 210

1          MS. REAGAN:  Object to form.  Foundation.
2          THE WITNESS:  Yes, he had used them for
3      years.
4 BY MR. WILHELM:
5 Q.   Does Tom Byrd still have an office at Group
6      Resources?
7 A.   Yes, sir.
8 Q.   Is he still getting paid?
9 A.   No, sir.
10 Q.  When did he cease to get paid?
11 A.  He ceased to be an employee September 30 of 2018.
12     He ceased to receive a paycheck on that date.
13 Q.  Okay.  Has he received any K-1 distributions or
14     ownership, profit-sharing or any payments of any
15     kind since 2018 from Group Resources or associated
16     entities?
17         MS. REAGAN:  Object to form.  Foundation.
18         THE WITNESS:  There was a purchase
19     agreement from Group Resources Acquisitions to Tom
20     Byrd.  In 2018, they had a structured buyout.
21 BY MR. WILHELM:
22 Q.  Okay.  So he's been receiving payments over time
23     pursuant to that?
24 A.  He did; yes, sir.
25 Q.  Do you know when the last one was made?

Page 211

1 A.   February or March of 2024.
2 Q.   So he just got his money and that was -- was that
3      the last one that was owed?
4 A.   No, sir.
5 Q.   How much more is owed?
6 A.   I don't recall.
7 Q.   So is he a creditor in the bankruptcy, any of the
8      bankruptcies?
9          MS. REAGAN:  Object to form.  Foundation.
10         THE WITNESS:  That would be a question
11     for bankruptcy counsel.
12 BY MR. WILHELM:
13 Q.   But as far as you know, under the structured
14     buyout, somebody owes Tom Byrd money based on the
15     agreements?
16         MS. REAGAN:  Object to form and
17     foundation.
18         THE WITNESS:  Again, that would be a
19     question for bankruptcy counsel.
20 BY MR. WILHELM:
21 Q.   Well, you just told me that March 2024 was not his
22     last scheduled payment; there were more payments to
23     be had by Mr. Byrd, correct?
24 A.   Yes, sir.
25 Q.   How much further into the future was it supposed to

Page 212

1      go?
2 A.   I don't recall.
3 Q.   Okay.  What was the amount of that payment in
4      March 2024?
5 A.   He was paid $35,000 monthly.
6 Q.   Okay.  Got it.
7 A.   Less some fees that were owed back to the company
8      for life insurance benefits that had been paid on
9      his behalf.
10 Q.  So what was the net, approximately?
11 A.  Thirty-two -- 31, 32,000 a month.
12 Q.  Thirty-one or 32 a month?
13 A.  Yes, sir.
14 Q.  And he's been getting that since 2018?
15 A.  Yes, sir.
16 Q.  And the last payment ceased in March of 2024?
17 A.  I believe the last payment was for February of '24.
18 Q.  Okay.  Why did it stop then?
19 A.  We had discovered the theft in March of 2024 and
20     stopped paying at that time.
21 Q.  Was he involved in the theft?
22 A.  No, sir; not to my knowledge.
23 Q.  Then why did you stop payment?
24 A.  Because we had to look at everything that had been
25     spent completely from that point.

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                        213..216

Page 213

1  Q.  Has anyone investigated whether he was involved?
2            MS. REAGAN:  Object to form.
3            MR. WILHELM:  To your knowledge.
4            MS. REAGAN:  Foundation.
5            THE WITNESS:  No, sir; no one has
6      investigated externally, no, sir.
7  BY MR. WILHELM:
8  Q.  What do you mean by externally?
9  A.  I've investigated, but I have not found any
10     evidence, but no one has investigated.
11 Q.  As far as you know?
12 A.  As far as I know.
13 Q.  Do you know if the FBI has interviewed him?
14 A.  I do not.
15 Q.  Okay.  Has he made a demand for his payments that
16     are owed him, the monthly payments of $35,000?
17 A.  Yes, sir.
18 Q.  And what's the status of that?
19 A.  He is not being paid currently.
20 Q.  What has he said to you all about that?
21 A.  That he needs the money and he wants to get paid.
22 Q.  Okay.  Has he threatened litigation?
23 A.  I don't recall.
24 Q.  Does he have a lawyer?
25 A.  Not to my knowledge.

Page 214

1  Q.  Do you know who his lawyers are in general?
2  A.  No, sir, I do not.
3  Q.  What's the position of yourself and/or Group
4      Resources on paying Mr. Byrd?
5            MS. REAGAN:  Object to form.  Foundation.
6            THE WITNESS:  He will receive no future
7      payments.
8            MR. WILHELM:  I'm sorry?
9            THE WITNESS:  He will receive no future
10     payments.
11 BY MR. WILHELM:
12 Q.  That's your position?
13 A.  Yes, sir.
14 Q.  Okay.  But it sounds like he could be a creditor in
15     the bankruptcies based on the obligations that are
16     owed to him under various contracts or at least one
17     contract, right?
18           MS. REAGAN:  Object to form.  Foundation.
19     Calls for a legal conclusion.
20           MR. WILHELM:  Go ahead.
21           THE WITNESS:  That would be a question
22     for bankruptcy counsel.
23 BY MR. WILHELM:
24 Q.  At least Mr. Byrd believes that's the case, right,
25     sir?

Page 215

1            MS. REAGAN:  Object to form and
2      foundation.
3            THE WITNESS:  I can't speak to what he
4      believes.
5  BY MR. WILHELM:
6  Q.  At least Mr. Byrd has asserted that that's the
7      case, right, sir?
8            MS. REAGAN:  Object to form and
9      foundation.
10           THE WITNESS:  Has asserted that?
11           MR. WILHELM:  That monies are owed to him
12     under one or more agreements.
13           THE WITNESS:  Yes, sir, he has asserted
14     that.
15           MR. WILHELM:  I thought so.
16           (Marked for identification:
17           Deposition Exhibit No. 10.)
18 BY MR. WILHELM:
19 Q.  All right.  I'm just going to mark this next
20     exhibit as Exhibit 10.  I'll ask you to just take a
21     look and let me know when you're ready.
22 A.  Okay.
23 Q.  Do you recognize this document, sir?
24 A.  Yes, sir.
25 Q.  Okay.  And just referring you to -- what is the

Page 216

1      document, please?
2  A.  It's a printout of text conversations between
3      myself, Janie Jackson and Sheila Autry.
4  Q.  And who is Janie Jackson, please?
5  A.  She is our accounts payable person.
6  Q.  The only one?
7  A.  Yes, sir.
8  Q.  Is she still employed, or no?
9  A.  No, sir.
10 Q.  When did she depart?
11 A.  The end of September.
12 Q.  Of this year?
13 A.  Yes, sir.
14 Q.  Do you know where she's working now?
15 A.  She's gone to work for Cornerstone.
16 Q.  This is the other entity that you have the LOI
17     with?
18 A.  Yes, sir.
19 Q.  Or the entity you have an LOI with, right, sir?
20 A.  That's correct.
21 Q.  How many of your employees have gone to work for
22     Cornerstone total?
23 A.  Three currently.
24 Q.  Who are they?
25 A.  Janie Jackson, Kelie West.  K-E-L-I-E, West.

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.          Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                              217..220

Page 217

1       Octavia, O-C-T-A-V-I-A, Young.
2  Q.   And how about HEZ -- do I have that right?
3  A.   Yes, sir.  Sheila Autry, Gail, G-A-I-L, McDougall,
4       David McDougall, Josette Fusilier, F-U-S-I-L-I-E-R,
5       Denise Bresky.
6  Q.   Where else have your employees gone, if you know?
7  A.   One went to Benefit Support in Gainesville, one
8       went to US Benefits, one has gone to The Benefit
9       Group.  I believe that's the only ones I'm aware of
10      where they have gone.
11 Q.   Okay.  Turning to July 3, 2024, in this exhibit, at
12      the bottom there's a "Ditto" and an American flag
13      sent by Janie Jackson.
14 A.   Okay.
15 Q.   Actually, next page, please.
16 A.   Next page back?
17 Q.   Next page of July 3, which is below.  You write to
18      Janie and Sheila, "Ladies, some good news for the
19      holiday.  Intact has approved a payment of
20      200,000," et cetera.  Do you see that?
21 A.   Yes, sir.
22 Q.   That's the part -- this is the same section I was
23      questioning you about earlier.
24 A.   Okay.
25 Q.   So I'm just giving you the document now.

Page 218

1  A.   Thank you.
2  Q.   And then going north of that, to the prior page,
3       July 5, this is where you write, "It will not be
4       2 million.  They are very clear there is no
5       coverage for client funds."  Do you see, sir?
6  A.   Yes, sir.
7  Q.   And you wrote that to Sheila and Janie?
8  A.   Yes, sir.
9           (Marked for identification:
10          Deposition Exhibit No. 11.)
11 BY MR. WILHELM:
12 Q.   All right.  Okay.  I'm handing you our next
13      exhibit, Exhibit 11.  I'll ask you to take a look
14      at that and let me know when you're ready.
15          Do you recognize that document, sir?
16 A.   Yes, sir.
17 Q.   What is it?
18 A.   It's an email from Dave Obermeyer to myself.
19 Q.   January 2024, correct?
20 A.   Yes, sir.
21 Q.   Someone at First Horizon in the middle, copying
22      Bobbie Whitt Docher -- there she is -- along with
23      Dave Obermeyer about transfers.  She writes, "Good
24      morning."  Sylvia Espinoza writes, "Please see
25      below the transactions clearing the accounts

Page 219

1       today," 0793, 44,000 and change for Ciena -- or
2       with respect to Ciena -- and then two other
3       accounts below that.
4           And then it says, "Also, the following
5       account" -- I think there's a typo; it should be
6       accounts, plural -- "are in the overdraft report
7       this morning."  Do you see that?
8  A.   Yes, sir.
9  Q.   And it lists four accounts associated with David
10      Obermeyer or Group Resources, right?
11          MS. REAGAN:  Object to form.  Foundation.
12      I'm going to instruct the witness not to answer
13      questions regarding this document or the amounts
14      stated in there and assert the Fifth Amendment
15      privilege.
16          MR. WILHELM:  Well, it's the witness' to
17      assert.
18          THE WITNESS:  Based on the advice of
19      counsel and a pending investigation, I'm exercising
20      my right under the Fifth Amendment to not answer
21      this question.
22          MR. WILHELM:  Well, I was just wondering
23      if you could tell me if those four accounts are
24      associated with Group Resources or not, the ones
25      that are in overdraft.

Page 220

1           MS. REAGAN:  If he can answer whether
2       those are Group Resources accounts, he can confirm
3       whether that's Group Resources.
4           THE WITNESS:  I believe they are Group
5       Resources accounts.  I do not believe that they
6       would have emailed him about personal accounts on a
7       Group Resources email thread.  And those
8       accounts -- at least two of which are in the list
9       that were provided by your client.
10 BY MR. WILHELM:
11 Q.   So at least the bank was under the impression from
12      you all that these were Group Resources accounts?
13          MS. REAGAN:  Object to form.  Foundation.
14          MR. WILHELM:  Go ahead.
15          THE WITNESS:  Based on this email, it
16      would appear that they were questioning these as
17      Group Resources accounts; yes, sir.
18 BY MR. WILHELM:
19 Q.   So what was the Fifth Amendment problem?  What
20      were you refusing to answer under the Fifth
21      Amendment?
22 A.   The question relating specifically to account 0793
23      for Ciena.
24          MR. WILHELM:  Okay.  Let's go ahead to
25      our next exhibit, Exhibit 12.

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                         221..224

Page 221

1          (Marked for identification:
2          Deposition Exhibit No. 12.)
3  BY MR. WILHELM:
4  Q.   I'll ask you to take a look at that and let me know
5       when you're ready.
6          Do you recognize this document, sir?
7  A.   Yes, sir.
8  Q.   All right.  And who is Denise, please?
9  A.   I believe --
10 Q.   Well, let me back up.
11         You recognize this document, right?
12 A.   Yes, sir.
13 Q.   And what is it?
14 A.   It's an email from Sheila Autry to Dave Obermeyer
15      and myself.
16 Q.   Thank you.
17         And who is Denise referenced in line 1,
18      please, of the body?
19 A.   Denise Bresky.
20 Q.   Who is she, please?
21 A.   She was in our provider service unit.
22 Q.   Okay.  She was interfacing with Ciena?
23 A.   She was interfacing with providers.
24 Q.   Okay.  Providers that have been -- for which claims
25      have been submitted under this Ciena plan, right?

Page 222

1  A.   All plans.
2  Q.   Right, but in this case, she's talking about Ciena,
3       right?
4  A.   Yes, sir.
5  Q.   All right.  So Denise approached Sheila concerned
6       that Denise would be -- "...would have over 200
7       claims on the Ciena escalation list for this week
8       and wondered if there was a better way to handle."
9       What's she talking about there, sir?
10         MS. REAGAN:  Object to form and
11      foundation and also instruct the client not to
12      answer and assert his Fifth Amendment privilege.
13         THE WITNESS:  Based on the advice of
14      counsel and a pending investigation, I'm exercising
15      my right under the Fifth Amendment to not answer
16      this question.
17         (Marked for identification:
18         Deposition Exhibit No. 13.)
19 BY MR. WILHELM:
20 Q.   Exhibit 13.  So May 11, 2022 appears to be the date
21      of the document.  Do you recognize this document,
22      sir?
23         MS. REAGAN:  Object to form.
24         THE WITNESS:  It appears to be an email
25      from Sheila Autry to Dave Obermeyer.

Page 223

1  BY MR. WILHELM:
2  Q.   Okay.  Have you ever seen this document before,
3       before today, if you know?
4  A.   I don't recall.
5  Q.   All right.  But in any event, you know who Sheila
6       Autry and David Obermeyer are, right?
7  A.   Yes, sir.
8  Q.   I'll ask you about this.  Do your best.
9          Dave says to Sheila, "Doesn't it seem like
10      our meetings are nothing but problems and negative
11      energy?"  I assume he means company meetings,
12      right?
13         MS. REAGAN:  Object to form.  Foundation.
14      The witness isn't on this email chain.
15         MR. WILHELM:  Go ahead, if you know.
16         THE WITNESS:  I don't know.  We didn't
17      have regular company meetings, so I'm not sure what
18      it's in reference to.
19 BY MR. WILHELM:
20 Q.   Well, he says "our meetings."  Maybe he's talking
21      about the leadership team, which is you, Dave and
22      Sheila, right?
23         MS. REAGAN:  Objection to form and
24      foundation.
25         MR. WILHELM:  Go ahead.

Page 224

1          THE WITNESS:  I don't know what he's
2       speaking of.
3  BY MR. WILHELM:
4  Q.   Were you the top three folks at Group Resources on
5       May 11, 2022, you, Dave and Sheila?
6  A.   There was a fourth.
7  Q.   Who was the fourth?
8  A.   Jennifer Potts.
9  Q.   Okay.  So maybe the four of you were the leadership
10      team at that time; fair to say?
11 A.   The four of us were the leadership team at that
12      time.
13 Q.   Okay.  So was he talking about a leadership team
14      meeting?
15 A.   I don't know.
16 Q.   Okay.  Sheila responds and apparently agrees with
17      him and says, "Yes, especially today.  Andy is
18      preoccupied."  That's you, right?
19         MS. REAGAN:  Object to form and
20      foundation.
21         MR. WILHELM:  Go ahead.
22         THE WITNESS:  Yes, sir.
23 BY MR. WILHELM:
24 Q.   She goes on to say, "I understand from Jennifer" --
25      that's Jennifer Potts, right? -- "that Andy has a

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                                         225..228

Page 225

1    call at 4:00 with Ciena," right?
2          MS. REAGAN:  Object to form and
3    foundation.
4          THE WITNESS:  That's what it says; yes,
5    sir.
6    BY MR. WILHELM:
7    Q.   It also says, "He," meaning Andy, "doesn't want
8    Tonya on the call," correct?
9          MS. REAGAN:  Object to form and
10   foundation.
11         THE WITNESS:  That is what it says.
12   BY MR. WILHELM:
13   Q.   That was Tonya, the account manager, correct?
14   A.   Yes.
15   Q.   So why didn't you want Tonya on that call?
16         MS. REAGAN:  Object to form.  Foundation.
17         THE WITNESS:  I don't recall this call
18   specifically.  I don't know.
19   BY MR. WILHELM:
20   Q.   Well, she says, "Andy doesn't know that I know he
21   has a call."  That's interesting.  "He may not know
22   that Jennifer knows."  What's that all about?
23         MS. REAGAN:  Object to form.  Foundation.
24   Mr. Wilhelm added some language to the email,
25   commentary to the email.

Page 226

1          MR. WILHELM: I don't think I did, but go
2    ahead.
3          THE WITNESS:  I don't know what it
4    relates to.
5    BY MR. WILHELM:
6    Q.   All right.  And then Dave follows up and says, "I
7    didn't mean negative towards him, but always in
8    general."  Do you know what he means by that?
9          MS. REAGAN:  Object to form.  Foundation.
10         THE WITNESS:  No, sir; I do not.
11   BY MR. WILHELM:
12   Q.   Ms. Autry responds, "Yes, I understand.  There are
13   too many things 'hanging' that we need to shore up
14   now that this move is over."  Do you know what
15   she's referring to?
16         MS. REAGAN:  Object to form and
17   foundation.
18         THE WITNESS:  I don't know what she's
19   referring to hanging; no, sir.
20         (Marked for identification:
21         Deposition Exhibit No. 14.)
22   BY MR. WILHELM:
23   Q.   I'm handing you what's been marked as Exhibit 14.
24   I'll ask you to take a look and let me know when
25   you're ready.  Ready?

Page 227

1    A.   Yes, sir.
2    Q.   Do you recognize this document?
3    A.   It's an email; yes, sir.
4    Q.   What is it?
5    A.   It's email from -- at the top from myself to Ryan
6    Jackson and Dave Obermeyer.
7    Q.   And below that there's an email chain that
8    includes -- it starts at the bottom with an email
9    from Krystal Kirma to Lisa Disharoon, and then
10   there's some highlights, ultimately sent to Sheila
11   and Tonya Dorsey from Lisa; do you see that on
12   page 2?
13   A.   Yes, sir.
14   Q.   And then Tonya then sends it along to Ryan Jackson,
15   Sheila and Lisa and asks Ryan a question about
16   releasing more claims for the member highlighted
17   below, right?
18   A.   Yes, sir.
19         MR. WILHELM:  By the way, I'm going to
20   mark this -- I'm going to seek to designate this as
21   confidential.  I think we've been talking about a
22   protective order in this case to protect
23   HIPAA-related information at least and I thought
24   both Ms. Morgan and Ms. Reagan were on board with
25   that in concept and we'll attempt to get something

Page 228

1    agreed upon and tendered this week.
2          MS. REAGAN:  All right.
3          MR. WILHELM:  So I want to sort of
4    designate this --
5          MS. REAGAN:  Got it.  I would agree.
6          MR. WILHELM:  -- confidential pursuant to
7    the anticipated protective order.
8          And I'll state for the record, any other
9    member names or PHI that may exist in this
10   deposition.
11         MS. REAGAN:  I agree.
12         MR. WILHELM:  Okay.  All right.  Thank
13   you, counsel.
14   BY MR. WILHELM:
15   Q.   So then ultimately Ryan asked a question -- excuse
16   me, Tonya asks the question to Ryan and Sheila,
17   saying, "Is there a possibility you can release
18   more claims for the member I've highlighted?"
19   right?  Page 2.
20         MS. REAGAN:  Object to form.  Foundation.
21         THE WITNESS:  I lost the question.
22   BY MR. WILHELM:
23   Q.   Ryan says, "Is there a possibility you can release"
24   -- sorry.  Tonya says to Ryan, "Is there a
25   possibility you can release more claims for the

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
229..232

Page 229

1    member I've highlighted?" right?
2         MS. REAGAN:  Object to form.  Foundation.
3         **THE WITNESS:  Yes, sir.**
4    BY MR. WILHELM:
5    Q.   Ryan then forwards it to Dave Obermeyer and to you
6    basically asking for your input, right?
7         MS. REAGAN:  Object to form and
8    foundation.
9         **THE WITNESS:  Yes, sir.**
10   BY MR. WILHELM:
11   Q.   And then Dave responds, "What's outstanding to this
12   particular member?"  Ryan responds, "32,000."  I'm
13   paraphrasing, but that's what he says there.
14        Then above, you respond to Ryan, "Ryan,
15   just spoke with Dave.  Go ahead and release the 19
16   lines in the file you sent.  Thanks," correct?
17        MS. REAGAN:  I'll instruct the -- object
18   to form.  I'll instruct client to confirm that the
19   document states what the document states and advise
20   him not to answer further with regard to payment or
21   release of claims or funds and assert the
22   attorney-client privilege.
23        **THE WITNESS:  That is what the document**
24   **states.**
25        MR. WILHELM:  There is no attorney-client

Page 230

1    privilege here, counsel.
2         MS. REAGAN:  I'm sorry, the Fifth
3    Amendment privilege.
4         MR. WILHELM:  Are you asserting the Fifth
5    Amendment for this -- with respect to this
6    document, sir?
7         **THE WITNESS:  I've affirmed what it**
8    **says.**
9    BY MR. WILHELM:
10   Q.   Well, this is talking about you -- clearly it's
11   talking about you instructing Ryan and Dave to
12   pay 19 lines of claims for this member that had
13   been backlogged for some period of time, right,
14   sir?
15        MS. REAGAN:  I'm going to object and
16   instruct the client -- the witness to assert his
17   Fifth Amendment privilege.
18        **THE WITNESS:  On advice of counsel and**
19   **based on a pending investigation, I'm asserting**
20   **my Fifth Amendment right to not answer the**
21   **question.**
22        (Whereupon a break was taken
23        from 1:35 p.m. to 1:42 p.m.)
24        MR. WILHELM:  We're back on the record
25   after a short break.

Page 231

1    BY MR. WILHELM:
2    Q.   Mr. Willoughby, during the break, did you review
3    any documents?
4    **A.   I did not.**
5    Q.   Did you speak to anyone other than counsel?
6    **A.   I did not.  I texted someone at the office about**
7    **the email server being down, but nothing about this**
8    **case, just to clarify.**
9         MR. WILHELM:  Thank you, Mr. Willoughby.
10        (Marked for identification:
11        Deposition Exhibit No. 15.)
12   BY MR. WILHELM:
13   Q.   I'm handing you our next exhibit, which is 15.
14   I'll ask you to take a look and let me know when
15   you're ready.  Okay?
16   **A.   Yes, sir.**
17   Q.   Do you recognize this document, sir?
18   **A.   Yes, sir.  It's an email to myself -- from myself**
19   **to Dave Obermeyer.**
20   Q.   All right.  And below that, an email from Sheila
21   Autry to Obermeyer and then from Dave to you,
22   correct?
23   **A.   Yes, sir.**
24   Q.   It starts out Sheila asking Dave -- she says,
25   "Dave, I just got a call from Robin in the phone

Page 232

1    unit regarding checks for the above" -- that is
2    Ciena.  Ciena checks from 2019, in fact, which is
3    two years prior -- "that are missing from Emdeon."
4    What's Emdeon, please?
5    **A.   Emdeon/Change Healthcare was the fulfillment vendor**
6    **we used for checks in production.**
7    Q.   That was also known as Change Healthcare at some
8    point?
9    **A.   Originally they were Emdeon and they became Change**
10   **Healthcare.**
11   Q.   It says, "The providers are calling back for
12   status.  Apparently this has been going on for
13   about six weeks."  Do you see that, sir?
14   **A.   Yes, sir.**
15   Q.   This is an example of unpaid claims, right, sir?
16        MS. REAGAN:  Object to form.  Foundation.
17   Calls for a legal conclusion.  And I'm going to
18   instruct the witness not to answer any questions,
19   asserting the Fifth Amendment.
20        **THE WITNESS:  On advice of counsel and**
21   **based on the investigation, I'm exercising my right**
22   **under the Fifth Amendment to not answer this**
23   **question.**
24   BY MR. WILHELM:
25   Q.   And I just want to clarify something.  Based on

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
233..236

Page 233

1    what investigation?  Based on what investigation?
2  A.    With the FBI.
3  Q.    All right.  So the next statement is, "Apparently
4    this has been going on for about six weeks."  Do
5    you see that?
6  A.    Yes, sir.
7  Q.    She says, "Do we have an update or do you know
8    what's going on?" right?  She's asking Dave,
9    correct?
10  A.    Yes, sir.
11  Q.    Dave forwards it to you, correct?
12  A.    Yes.
13  Q.    And then you respond to Dave and you say what?
14  A.    The email reads, "I know what has happened.  We can
15    discuss tomorrow."
16  Q.    Okay.  Did you in fact know what happened?
17         MS. REAGAN:  Object to form.  I'm going
18    to instruct the witness not to answer the question
19    and assert the Fifth Amendment privilege.
20         THE WITNESS:  Based on advice of counsel,
21    I'm exercising my right under the Fifth Amendment
22    to not answer this question.
23  BY MR. WILHELM:
24  Q.    Did you, in fact, discuss it with Dave the next
25    day?

Page 234

1         MS. REAGAN:  Same objection, same
2    instruction.
3         THE WITNESS:  Again, based on advice of
4    counsel, I'm exercising my right under the Fifth
5    Amendment to not answer this question.
6         (Marked for identification:
7         Deposition Exhibit No. 16.)
8  BY MR. WILHELM:
9  Q.    I'll hand you what's being marked as Exhibit 16.
10    I'll ask you to take a look and let me know when
11    you're ready.
12         Do you recognize this document, sir?
13  A.    I'm still reading.  Yes, sir.
14  Q.    Okay.  What is it?
15  A.    It's an email from Sheila Autry to myself and Dave
16    Obermeyer.
17  Q.    Attaching what?
18  A.    Conversations for the benefit advisors and Tonya
19    Dorsey referred to as the Ciena phone dialogue.
20  Q.    So it's not a conversation, it's basically talking
21    points for what to say when you're dealing with
22    calls about unpaid claims, right, sir?
23  A.    It's a document to respond to questions regarding
24    claim status.
25  Q.    Claims that haven't been paid yet, right, sir?

Page 235

1         MS. REAGAN:  Object to form.
2         THE WITNESS:  It could be all types of
3    claims, both paid and unpaid.  I don't know what
4    the calls would be relating to until they were
5    taken.
6  BY MR. WILHELM:
7  Q.    Look in the middle of the dialogue.  It says,
8    "Important."  Under that, "If the patient calls and
9    indicates they are in collections" -- that would be
10    because the provider hasn't been paid and the
11    provider is suing them and sending them to
12    collections, right, sir?
13         MS. REAGAN:  Object to form.  Foundation.
14         MR. WILHELM:  Go ahead.
15         THE WITNESS:  It would indicate the
16    provider has not recorded payment; that's correct.
17         MR. WILHELM:  Okay.  I see.  I see what
18    you're trying to do here, but if --
19         MS. REAGAN:  Object to --
20  BY MR. WILHELM:
21  Q.    If they're going to collections, the provider
22    believes it hasn't been paid yet, correct?
23         MS. REAGAN:  Object to form and
24    foundation.  I'll instruct the witness not to
25    answer on the basis of the Fifth Amendment

Page 236

1    privilege.
2         THE WITNESS:  Based on the advice of
3    counsel, I'm exercising my right under the Fifth
4    Amendment to not answer this question.
5  BY MR. WILHELM:
6  Q.    Who was the author of this dialogue and the FAQs?
7         MS. REAGAN:  Object to form and
8    foundation.
9         MR. WILHELM:  Go ahead, sir.
10         THE WITNESS:  It appears to have come
11    from Sheila Autry.
12  BY MR. WILHELM:
13  Q.    Who was the author, sir?
14         MS. REAGAN:  Object to form and
15    foundation.  Asked and answered.
16         THE WITNESS:  I do not know.
17  BY MR. WILHELM:
18  Q.    At the bottom -- is it possible that you
19    participated in the authorship of this document,
20    sir?
21         MS. REAGAN:  Object to form.  Foundation.
22    Instruct the witness to not answer the question and
23    assert the Fifth Amendment privilege.
24         THE WITNESS:  Based on the advice of
25    counsel, I exercise my right under the Fifth

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                         237..240

---

Page 237

1     Amendment to not answer that question.
2  BY MR. WILHELM:
3  Q.   In fact, at the bottom it says -- with three stars
4       -- "It is really important that the name of Ciena
5       or Ciena Healthcare Management not be used when
6       talking to providers.  If a provider is calling, we
7       really want to try and provide them with as little
8       information as possible," right, sir?
9          MS. REAGAN:  Object to form and
10      foundation and same instruction.
11         THE WITNESS:  Based upon the advice of
12      counsel, I exercise my rights under the Fifth
13      Amendment to not answer that question.
14 BY MR. WILHELM:
15 Q.   When Sheila sent you this document, she sent it to
16      both you and Dave Obermeyer, right, sir?
17 A.   Yes, sir; that's what it says.
18 Q.   To your knowledge, did Dave Obermeyer place an
19      objection to any of the content or tone of this
20      dialogue or the FAQs that followed it?
21         MS. REAGAN:  Object to form.  Foundation.
22         THE WITNESS:  I don't recall.
23 BY MR. WILHELM:
24 Q.   So to your knowledge, did you object to the tone or
25      form or content of the dialogues or the FAQs that

---

Page 238

1       followed it?
2          MS. REAGAN:  Object to form and
3       foundation and same instruction to assert the Fifth
4       Amendment privilege.
5          THE WITNESS:  Based on the advice of
6       counsel, I'm exercising my right under the Fifth
7       Amendment to not answer that question.
8  BY MR. WILHELM:
9  Q.   When she says "the examiners" on line 2, who does
10      she mean by that, please?
11 A.   The benefit advisors that process the claims.
12 Q.   The last sentence there, Sheila says to you and
13      Mr. Obermeyer, "The provider unit ladies at least
14      need that as an out to get the provider off the
15      phone."  Do you see where she says that?
16 A.   I see that; yes, sir.
17 Q.   Did you agree with that statement at the time?
18         MS. REAGAN:  Object to form.  I'll
19      instruct the witness not to answer and assert the
20      Fifth Amendment privilege.
21         THE WITNESS:  Based on the advice of
22      counsel, I'm exercising my right under the Fifth
23      Amendment to not answer that question.
24         (Marked for identification:
25         Deposition Exhibit No. 17.)

---

Page 239

1          MR. WILHELM:  I'm handing you the next
2       exhibit, which is going to be Exhibit 17.  Let me
3       ask you to take a look at that document and let me
4       know when you're ready.  And again, the attachment
5       here is being marked confidential under the
6       anticipated protective order.
7          MS. REAGAN:  Agreed.
8          THE WITNESS:  Yes, sir.
9          MR. WILHELM:  At least the attachment is,
10      not the first page.  So the question is -- and by
11      the way, we may end up just redacting PHI.  I don't
12      think that whole attachment is confidential.  I
13      think that the name of the patient is and should be
14      redacted appropriately, but the rest is not.
15 BY MR. WILHELM:
16 Q.   With respect to this -- have you ever seen this
17      document before, sir?
18 A.   Not that I recall.
19 Q.   All right.  It's from Tonya Dorsey, the Ciena
20      account manager at the time, right, sir?
21 A.   Yes, sir.
22 Q.   To Dave Obermeyer, your CFO at Group Resources,
23      right?
24 A.   At the time; yes, sir.
25 Q.   It says, "Dixon EOB," and attached is an

---

Page 240

1       explanation of benefits, right, sir?
2  A.   Yes, sir.
3  Q.   That's what an -- EOB stands for explanation of
4       benefits, right, sir?
5  A.   Correct.
6  Q.   And do you know why Tonya is asking Dave Obermeyer
7       if this check has cleared?
8          MS. REAGAN:  Object to form.  Foundation.
9          THE WITNESS:  I do not.
10 BY MR. WILHELM:
11 Q.   Do you know whether that check ever cleared?
12         MS. REAGAN:  Object to form.  Foundation.
13      Instruct the client -- the witness not to answer
14      and assert the Fifth Amendment privilege.
15         THE WITNESS:  Based on the advice of
16      counsel, I'm exercising my right under the Fifth
17      Amendment to not answer that question.
18 BY MR. WILHELM:
19 Q.   Did you know that Group Resources issued a bunch of
20      checks that they represented to Ciena as having
21      been made but in fact never reached their
22      destination or never cleared?
23         MS. REAGAN:  Object to form.  Foundation.
24      And instruct the witness not to answer and assert
25      his Fifth Amendment privilege.

---

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                        241..244

Page 241

1         THE WITNESS:  Based on the advice of
2   counsel, I'm exercising my right under the Fifth
3   Amendment to not answer that question.
4         (Marked for identification:
5         Deposition Exhibit No. 18.)
6   BY MR. WILHELM:
7   Q.   Exhibit 18.  I'll ask you to take a look at this
8   document and let me know when you're ready.
9   A.   Okay.
10  Q.   Do you recognize this document?
11  A.   It's an email from Sheila Autry to Dave Obermeyer
12  and myself.
13  Q.   Attaching another EOB?
14  A.   Yes, sir.
15        MR. WILHELM:  Again, same as the last one
16  with respect to redactions.
17  BY MR. WILHELM:
18  Q.   And Mr. Willoughby, what is going on in this email
19  chain, please?
20        MS. REAGAN:  Object to form.  And I will
21  instruct the witness not to answer and assert his
22  Fifth Amendment privilege.
23        THE WITNESS:  Based on the advice of
24  counsel, I'm exercising my right under the Fifth
25  Amendment to not answer this question.

Page 242

1   BY MR. WILHELM:
2   Q.   You can't even tell me what's going on in this
3   email chain about getting a provider paid under an
4   ERISA benefit plan?
5         MS. REAGAN:  Object to form.  Same
6   instruction.
7         THE WITNESS:  Based on advice of counsel,
8   I'm exercising my right under the Fifth Amendment
9   to not answer this question.
10  BY MR. WILHELM:
11  Q.   I will ask you a more specific question and you can
12  field this one if you're able.  She says -- Sheila
13  says to you, line 5 of the body of the top portion,
14  she says, "Some people are nicer than others and
15  it's only getting worse."  What is she talking
16  about there, sir?
17        MS. REAGAN:  Object to form.  Foundation.
18  Same instruction.
19        THE WITNESS:  Based on advice of counsel,
20  I'm exercising my right under the Fifth Amendment
21  to not answer that question.
22        MS. REAGAN:  Also, Paul, on confidential,
23  I think that more than just the name needs to be
24  redacted on these.  Like account numbers, claim
25  number, the nature of the service should also be

Page 243

1   redacted.
2         MR. WILHELM:  We can talk about it after
3   off the record.
4         MS. REAGAN:  That's fine.
5         MR. WILHELM:  I don't necessarily agree,
6   but if it's PHI, I would agree, but I don't think
7   the claim numbers are confidential.
8         THE WITNESS:  I would think provider name
9   would be confidential if a person went to see a
10  psychologist or oncologist and that was in the
11  name.
12        MR. WILHELM:  We can talk about it after,
13  but --
14        THE WITNESS:  Just my thought on that.
15        MR. WILHELM:  -- if the individual is
16  named connecting to that provider, that would be
17  one thing, but if it's just a provider, not
18  necessarily.
19        (Marked for identification:
20        Deposition Exhibit No. 19.)
21  BY MR. WILHELM:
22  Q.   All right.  The next one is 19.  I'll ask you to
23  take a look and let me know when you're ready.
24        Do you recognize this document, sir?
25  A.   I don't know that I've seen it before.

Page 244

1   Q.   Okay.  So do you know why Dave is telling Sheila,
2   "We should have never brought up what we did on
3   Wednesday"?  Do you know what they're referring to
4   there?
5         MS. REAGAN:  Object to form and
6   foundation and instruct the witness not to answer
7   and assert the Fifth Amendment privilege.
8         THE WITNESS:  Based on the advice of
9   counsel, I'm exercising my right under the Fifth
10  Amendment to not answer that question.
11        (Marked for identification:
12        Deposition Exhibit No. 20.)
13  BY MR. WILHELM:
14  Q.   Next exhibit is 20.  I'll ask you to take a look
15  and let me know when you're ready.
16        Do you recognize this document, sir?
17  A.   Yes, sir.
18  Q.   All right.  Cofinity was the provider network that
19  you all were using for the Ciena plant at that
20  time?
21  A.   And other plans; yes, sir.
22  Q.   Middle of the page, April 6, 2020, Sheila writes to
23  you and Dave, "Andy, I received a status request
24  from Cofinity related to checks over one year old."
25  Do you see that?

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                        245..248

Page 245

1  A.   Yes, sir.
2  Q.   Do you know what she's referring to there?
3           MS. REAGAN:  Object to form and
4       foundation.  Instruct the witness not to answer and
5       assert the Fifth Amendment privilege.
6           THE WITNESS:  Based on the advice of
7       counsel, I'm going to assert my right under the
8       Fifth Amendment to not answer that question.
9  BY MR. WILHELM:
10  Q.   In fact, the next sentence says, "May I know where
11      we are with this Ciena releases" -- I guess that
12      means payment or check releases -- "because
13      reissuing check" -- should be "checks," plural --
14      "exceeding one year affects the examiners and their
15      workload?"  Do you see that, sir?
16          MS. REAGAN:  Object to form and
17      foundation and instruct the witness not to answer
18      and assert the Fifth Amendment privilege.
19          THE WITNESS:  Based on advice of counsel,
20      I'm asserting my right under the Fifth Amendment to
21      not answer that question.
22  BY MR. WILHELM:
23  Q.   And Ms. Autry then goes on to say, "I just checked"
24      -- and she's the VP of claims and administration at
25      that time for Group Resources, right, sir?

Page 246

1  A.   That is correct.
2  Q.   She says, "I just checked and have three, so I fear
3       there are many."  What is she referring to there,
4       sir?
5           MS. REAGAN:  Same objections and same
6       instruction.
7           THE WITNESS:  Based on the advice of
8       counsel, I'm exercising my right under the Fifth
9       Amendment to not answer that question.
10  BY MR. WILHELM:
11  Q.   Her last sentence says, "I'm asking so that I know
12      how to do damage control on the inside," right,
13      sir?
14          MS. REAGAN:  Object to form and
15      foundation.  Same instruction.
16          THE WITNESS:  Based on the advice of
17      counsel, I'm exercising my right under the Fifth
18      Amendment to not answer the question.
19          MS. MORGAN:  Can we break after that
20      question, Paul?
21  BY MR. WILHELM:
22  Q.   Do you know what damage control needs to be
23      done -- needed to be done according to
24      Ms. Autry?
25          MS. REAGAN:  Same objection, same

Page 247

1       instruction.
2           THE WITNESS:  Based on the advice of
3       counsel, I'm exercising my right under the Fifth
4       Amendment to not answer that question.
5  BY MR. WILHELM:
6  Q.   And very quickly, at the top you responded to Dave,
7       not copying Sheila, and said, "Let's discuss in the
8       morning and I will answer" -- meaning "I'll answer
9       to Sheila" -- "and we'll come up with an answer
10      between the two of us and instruct her as to how we
11      want this to go," right, sir?
12          MS. REAGAN:  Object to form.  Misstates
13      the email.
14          MR. WILHELM:  No, it doesn't.
15          MS. REAGAN:  And instruct the witness not
16      to answer and assert the Fifth Amendment.
17          THE WITNESS:  Based on the advice of
18      counsel, I assert my right under the Fifth
19      Amendment to not answer that question.
20          MR. WILHELM:  We'll take a short break
21      for Ms. Morgan's hearing and go off the record.
22          (Whereupon a break was taken
23           from 2:02 p.m. to 2:48 p.m.)
24          MR. WILHELM:  Back on the record after a
25      short break for lunch.

Page 248

1  BY MR. WILHELM:
2  Q.   Mr. Willoughby, during the lunch period, did you
3       review any documents?
4  A.   I did not.
5  Q.   Did you speak to anyone other than your counsel?
6  A.   My wife.
7  Q.   Okay.  What did you guys talk about?
8  A.   She just asked how the day was going, I asked how
9       she was feeling, what time my flight was.
10  Q.   Anything else?
11  A.   No, sir.
12  Q.   All right.  I asked you earlier about, I think,
13      real estate, but do you own any land, sir, other
14      than the home -- other than the land on which your
15      home is built?
16  A.   No, sir.
17  Q.   Do you have any interest in any land?
18  A.   I do not.
19  Q.   Okay.  Are you familiar that -- are you familiar
20      with the fact that Obermeyer bought a piece of
21      property in 2019 from Sheila Autry?
22  A.   Yes, sir.
23  Q.   And he paid with a Group Resources check?
24  A.   I found that out after fact; yes, sir.
25  Q.   Did you know that he told her at the time that he

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
249..252

Page 249

1  was paying with a Group Resources check and that he
2  had told you about it?
3  A.  I did not know that at the time.
4  Q.  And did you know that he said to her that he had
5  already paid Group Resources back the money?
6  A.  I did not know that at the time.
7  Q.  Do you know what the amount of the check was?
8  A.  $6,000, I believe.
9  Q.  Okay.  Do you know the nature of it; was it land or
10  what or --
11  A.  It was land.
12  Q.  Was it made payable to Sheila Autry personally?
13  A.  I do not know.
14  Q.  Okay.  Do you know where it was?
15  A.  Northeast Georgia somewhere.
16  Q.  Is it the land on which one of his homes was built
17  or currently sits?
18       MS. REAGAN:  Object to form and
19  foundation.
20       THE WITNESS:  I don't know that he has a
21  home on that land; no, sir.
22  BY MR. WILHELM:
23  Q.  Okay.  Do you know what came of that land?
24  A.  No, sir.
25  Q.  Have you ever been to Dave Obermeyer's house?

Page 250

1  A.  Yes.
2  Q.  How many times?
3  A.  Twice, I believe.
4  Q.  That's it?
5  A.  I believe, yes, sir.
6  Q.  Total time is less than five; less than five times?
7       MS. REAGAN:  Object to form.  Asked and
8  answered.
9       THE WITNESS:  Yes, sir, I believe I've
10  only been twice.
11  BY MR. WILHELM:
12  Q.  Okay.  We're talking about his current home, right?
13  A.  Yes, sir.
14  Q.  How about for the whole period of time for all of
15  eternity; how many times have you been to a home in
16  which Dave Obermeyer lived?
17  A.  Only those two times to the current home -- well,
18  what I know to be the current home.
19  Q.  When is the last time you spoke with Dave
20  Obermeyer?
21  A.  Via text, in mid May; in person, March 11, I
22  believe.
23  Q.  How about on the phone?
24  A.  That was on -- March 11, I'm sorry, was on the
25  phone.  I'm sorry.

Page 251

1  Q.  When is the last time you talked to him on the
2  phone?
3  A.  March 11, I believe.
4  Q.  Okay.  Have you spoken with him in the presence of
5  counsel in which he and you were there on a call or
6  on Zoom with counsel present?
7       MS. REAGAN:  Object to form.
8       MR. WILHELM:  This calendar year.  To be
9  clear, I assume you all may have -- I'm sorry,
10  that's a tough question.  It was badly worded
11  question.  I apologize.
12  BY MR. WILHELM:
13  Q.  In the calendar year 2024, have you and
14  Mr. Obermeyer been on any calls on which counsel
15  were present together?
16  A.  Not that I recall.
17  Q.  Okay.  How about since his separation?
18  A.  No, sir.
19  Q.  Okay.  Did Obermeyer ever pay back Group Resources
20  the $6,000?
21  A.  Not to my knowledge.
22  Q.  Okay.  So basically on your watch, you allowed your
23  CFO to pay for a personal piece of land for $6,000
24  off of your company's accounts, one or more
25  accounts?

Page 252

1       MS. REAGAN:  Object to form.
2  Argumentative.
3       THE WITNESS:  He did purchase land using
4  a company check, not with my authority, while I was
5  president.
6  BY MR. WILHELM:
7  Q.  While you were president and CEO?
8  A.  Yes, sir.
9  Q.  So that was on your watch?
10       MS. REAGAN:  Object to form.
11       THE WITNESS:  It was while I was
12  president and CEO; yes, sir.
13       (Marked for identification:
14       Deposition Exhibit No. 21.)
15  BY MR. WILHELM:
16  Q.  I'll hand you what's been marked as our next
17  exhibit, Exhibit 21.
18       I'll ask you to take a look at this and
19  let me know when you're ready.
20  A.  Okay.  Yes, sir.
21  Q.  Recognize this document?
22  A.  Yes, sir.
23  Q.  What is it?
24  A.  It is a notice of termination of our administrative
25  services agreement from Ciena Healthcare.

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
253..256

Page 253

1  Q.   And you received this letter?
2  A.   Yes, sir.
3  Q.   Turn to page 2.  It says, "In addition, please
4       ensure" -- you received this letter via email, did
5       you not, on or about August 19?
6  A.   I believe so.
7  Q.   From Mr. Miller?
8  A.   I believe so.
9  Q.   Okay.  And then on page 2, it says, "In addition,
10      please ensure EBC and its agents preserve and do
11      not destroy, alter, modify or delete all documents,
12      records, data, correspondence," et cetera, "that in
13      any way reflects, refers or relates to the plan,
14      its participants or beneficiaries or EBC's service
15      to Ciena and/or the plan over time."  Do you see
16      that, sir?
17 A.   Yes, sir.
18 Q.   Has anyone associated with EBC or Group Resources
19      engaged in document shredding or destruction since
20      the date this letter was received?
21          MS. REAGAN:  Object to form and
22      foundation.
23          THE WITNESS:  Documents that were scanned
24      were shredded after being scanned, but there is a
25      digital image of those documents.

Page 254

1  BY MR. WILHELM:
2  Q.   And are we talking about -- was that done -- who
3       authorized that to occur?
4  A.   I did.
5  Q.   Okay.  When did you start doing that process?  How
6       long had you been doing what you just described?
7  A.   Since 2021.
8  Q.   Okay.  So this is a document retention sort of
9       practice --
10 A.   Yes, sir.
11 Q.   -- that you did not interrupt when you got this
12      letter, correct?
13 A.   No, sir, because the images were still available.
14 Q.   Okay.  Are they still available now?
15 A.   Yes, sir.
16 Q.   And who ensures that; in other words, who is
17      responsible for maintaining the digital record of
18      the documents, for example?
19 A.   It's on Group Resources' servers.
20 Q.   Do you have a plan, as you attempt to wind up
21      operations, for the retention of those documents?
22 A.   The servers will be going to a co-location space to
23      be accessible at some point later this year.
24 Q.   To be accessible by whom?
25 A.   Myself and other employees of Group Resources,

Page 255

1       should there be any.
2  Q.   What if there are no other employees at Group
3       Resources at that time?
4  A.   I would be the person able to access them still.
5  Q.   Only you?
6  A.   Yes, sir.
7  Q.   What if something happens to you between now and
8       then causing you to be physically unable to do
9       that?  What's the back-up plan?
10 A.   I don't know.
11 Q.   When is the date set for the -- as far as you
12      understand, what is the date set for employees of
13      Group Resources to separate from the companies?
14 A.   All but one will be leaving at the end of October.
15 Q.   That would be -- the end of October is in nine
16      days.
17 A.   Yes, sir.
18 Q.   So in nine days, all but one will leave?
19 A.   Yes, sir.
20 Q.   What's the date -- are they all on through
21      October 31 or are they departing before October 31?
22 A.   All through October 31.
23 Q.   And who is the one who is not?
24 A.   Chelsea Autry.
25 Q.   Is she related to Sheila?

Page 256

1  A.   It's her daughter-in-law.
2  Q.   Her daughter-in-law.
3          Okay.  That was her husband and
4       father-in-law who picked up the 206 boxes from
5       Obermeyer?
6  A.   Yes, sir.
7          MS. REAGAN:  Object to form and
8       foundation.
9  BY MR. WILHELM:
10 Q.   The ones you testified about on October 1 when
11      Mr. Hickey was here?
12 A.   Yes, sir.
13 Q.   Okay.  So why -- what is her title currently?
14 A.   She generates check registers and is recording
15      receipts, making deposits into the bank.  She's
16      doing the accounting functions.
17 Q.   Who oversees the generation of check registers
18      currently?
19 A.   I do.
20 Q.   Who did previously?
21 A.   Dave Obermeyer.
22 Q.   Okay.  And you also?
23 A.   They were directly under his purview.
24 Q.   But he reported to you, right?
25 A.   Yes, sir.

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
257..260

---

Page 257

1 Q.   At all times?
2 A.   Yes, sir.
3 Q.   How about Sheila Autry, was she involved in
4      generating check registers?
5 A.   No, sir.
6 Q.   So just Dave and who at that time?
7           MS. REAGAN:  Object to form.  Go ahead.
8           THE WITNESS:  Most recently, Chelsea
9      Autry.
10          MR. WILHELM:  Okay.
11          THE WITNESS:  There were others in
12     back-up roles for that.
13 BY MR. WILHELM:
14 Q.   Before her, who was it?
15 A.   Kelie West, I believe.
16 Q.   Who else?
17 A.   Amelia Vega.  I'm not sure prior to that.  That
18     goes back three or four years.
19 Q.   Okay.  Are you familiar with how exactly Dave
20     Obermeyer did prepare the check registers or
21     generate the check registers with the assistance of
22     others or by himself?
23 A.   I don't know that he generated the check registers.
24     Others generated them that worked for him.
25 Q.   Under his direction?

---

Page 258

1 A.   Under his direction.
2 Q.   Okay.  But are you familiar with instructions he
3      may have given to those people about the check
4      registers?
5 A.   No, sir.
6 Q.   Are you familiar with what the plan was with
7      respect to the check registers and how they would
8      be presented to the clients?
9           MS. REAGAN:  Object to form.  Asked and
10     answered.
11          THE WITNESS:  No, sir.
12 BY MR. WILHELM:
13 Q.   Who is familiar with what I just said?
14 A.   Mr. Obermeyer would be, I believe.
15 Q.   Anybody else?
16 A.   I don't know.
17 Q.   The women that he supervised?
18 A.   Possibly.
19 Q.   Anybody else, as far as you know?
20 A.   No, sir, I don't know of anyone else.
21          (Marked for identification:
22          Deposition Exhibit No. 22.)
23 BY MR. WILHELM:
24 Q.   Okay.  I'll hand you what's been marked as
25     Exhibit 22.  Do you recognize this document,

---

Page 259

1      sir?
2 A.   It's an email from Sheila Autry to myself, dated
3      May 4, 2020.
4 Q.   Okay.  Would you agree there's a number of emails
5      here on the chain and there's an exchange back and
6      forth; fair to say?
7 A.   Yes, sir.
8 Q.   So down below, from Denise Bresky to Sheila
9      Autry -- and Denise was in what role, please?
10 A.   Provider services.
11 Q.   For Group Resources, right?
12 A.   Yes.
13 Q.   She says "Sheila" -- at the bottom of the page,
14     "Sheila, I had a caller" -- maybe that's "a call"
15     -- "regarding Ciena claims over one year.  She and
16     I had spoken many times.  She is done with me.
17     LOL" -- laugh out loud.  "She would like a call
18     from the president regarding these claims."  Do you
19     see that, sir?
20 A.   Yes, sir.
21 Q.   What was that referring to, sir?
22          MS. REAGAN:  Object to form and
23     foundation and instruct the witness to not answer
24     and assert the Fifth Amendment privilege.
25          THE WITNESS:  Based on the advice of

---

Page 260

1      counsel, I'm exercising my Fifth Amendment right to
2      not answer that question.
3 BY MR. WILHELM:
4 Q.   All right.  Then you say -- Sheila then responds
5      to -- Sheila forwards the email request from Denise
6      to you and Dave Obermeyer, saying, "Andy, I've
7      asked Tonya to put the checks for this tax ID on
8      the immediate release list."  So you guys had an
9      immediate release list that you and Obermeyer knew
10     about, sir?
11          MS. REAGAN:  Same objection and same
12     instruction.
13          THE WITNESS:  Based on the advice of
14     counsel, I will exercise my right under the Fifth
15     Amendment to not answer that question.
16 BY MR. WILHELM:
17 Q.   Now sir, doesn't that mean there were unpaid claims
18     that once providers started complaining loud enough
19     to try to shut them up or buy more time, you would
20     place these unpaid claims on an immediate release
21     list?
22          MS. REAGAN:  I'm going to object to the
23     form and foundation and characterization of
24     Mr. Wilhelm's -- the characterization of this email
25     that Mr. Wilhelm has put on this and instruct the

---

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024    261..264

Page 261

1  witness not to answer and assert the Fifth
2  Amendment privilege.
3  **THE WITNESS:  Based on the advice of**
4  **counsel, I'm exercising my right under the Fifth**
5  **Amendment to not answer this question.**
6  BY MR. WILHELM:
7  Q.   Sheila says, "I will attempt to call her back,
8  but I may not be good enough.  These calls are
9  coming more frequently.  There has to be
10  something we can do to persuade the group to
11  release the old checks.  Quite frankly, this is
12  getting old."
13      What's she referring to, sir?
14      MS. REAGAN:  Object to form and
15  foundation and same instruction.
16      **THE WITNESS:  Based on the advice of**
17  **counsel, I'm exercising my right under the Fifth**
18  **Amendment to not answer these questions.**
19  BY MR. WILHELM:
20  Q.   In fact, you knew exactly what she was referring
21  to, didn't you, sir?
22      MS. REAGAN:  Object to form.
23  Argumentative.  And same instruction.
24      **THE WITNESS:  Based on the advice of**
25  **counsel, I'm exercising my Fifth Amendment right to**

Page 263

1  Q.   And who is Robin that's referenced in here in the
2  subject line and the first line?
3  **A.   Robin Jakucenis.**
4  Q.   One of your employees at the time?
5  **A.   Yes, sir.**
6  Q.   Where is she nowadays?
7  **A.   I don't know.**
8  Q.   Did she separate employment?
9  **A.   Yes, sir.**
10  Q.   About when, please?
11  **A.   End of September.**
12  Q.   Of this year?
13  **A.   Yes, sir.**
14  Q.   How do you spell her last name?
15  **A.   J-A-K-U-C-E-N-I-S.**
16  Q.   Do you know where she went to work?
17  **A.   I don't believe she has yet.**
18  Q.   Okay.  Where does she live, please?
19  **A.   I don't know.**
20  Q.   Georgia?
21  **A.   Yes, sir.**
22  Q.   Was she in the Duluth office?
23  **A.   Yes.**
24  Q.   Is she married?
25  **A.   Yes.**

Page 262

1  **not answer this question.**
2  BY MR. WILHELM:
3  Q.   While it's clear from the email, sir, you said to
4  Sheila in writing, copying Dave Obermeyer, taking
5  responsibility and charge because you knew exactly
6  what was going on and you said, "I'll be glad to
7  call her tomorrow," right, sir?
8      MS. REAGAN:  Object to form.
9  Argumentative.  Same instruction.
10      **THE WITNESS:  Based on the advice of**
11  **counsel, I'm exercising my Fifth Amendment right to**
12  **not answer this question.**
13      (Marked for identification:
14      Deposition Exhibit No. 23.)
15  BY MR. WILHELM:
16  Q.   I'm handing you our next exhibit, which is 23.
17  I'll ask you to take a look and let me know when
18  you're ready.
19  **A.   Okay.**
20  Q.   Okay.  This email -- you recognize this document,
21  sir?
22  **A.   It's an email from Sheila Autry to myself and Dave**
23  **Obermeyer.**
24  Q.   All right.  Dated January 27, 2022, right?
25  **A.   Yes, sir.**

Page 264

1  Q.   About how old is she?  Estimate.  I know that's a
2  dangerous question.
3      MS. REAGAN:  Object to form and
4  foundation, just for the sake of Robin.
5      MR. WILHELM:  Asking a woman's age --
6      **THE WITNESS:  Fifties.**
7      MR. WILHELM:  Just approximately.
8      **THE WITNESS:  In her 50s, I believe.**
9  BY MR. WILHELM:
10  Q.   So it says here -- what's this email about?
11      MS. REAGAN:  Object to form.  Foundation.
12  And I'll instruct the witness to not answer and
13  assert the Fifth Amendment privilege.
14      **THE WITNESS:  Based on advice of counsel,**
15  **I will exercise my right under the Fifth Amendment**
16  **to not answer this question.**
17  BY MR. WILHELM:
18  Q.   So you're exercising the Fifth Amendment, to be
19  clear, about what Sheila Autry is stating to you in
20  an email from 2022, sir?
21      MS. REAGAN:  Object to form.  Same
22  instruction.
23      **THE WITNESS:  I'm exercising my right**
24  **under the Fifth Amendment, based on the advice of**
25  **counsel, to not answer this question.**

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.          Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                              265..268

Page 265

1  BY MR. WILHELM:
2  Q.    In fact, Ms. Autry tells you and Mr. Obermeyer what
3        she told Robin Jakucenis.  She says, "I told her
4        that Andy" -- Andy Willoughby, that is -- "had been
5        working with Ciena and they had a plan to resolve
6        their issues, but it would take some time.  I let
7        her know that I would help her with the calls for
8        the ones she can no longer handle.  Then I asked if
9        more money would help her decide and she said that
10       always helps," right, sir?
11 A.   That is what it reads.
12 Q.   What calls did she need help with?
13              MS. REAGAN:  Object to form and
14       foundation.  Instruct the witness not to answer and
15       assert the Fifth Amendment.
16              THE WITNESS:  Based on advice of counsel,
17       I'll exercise my right under the Fifth Amendment to
18       not answer that question.
19 BY MR. WILHELM:
20 Q.    In the middle paragraph, it says -- this is stuff
21       you knew about, sir, because it says, "Both of you
22       know" -- not just about Obermeyer, but you too.
23       Knew that Sheila had "struggled to keep people in
24       that department and the sole reason was Ciena."
25       And then she goes on to say it's the providers who

Page 266

1        are not getting paid is the issue.  She says,
2        "These providers back you into a wall and it's hard
3        to get out of," right, sir?
4               MS. REAGAN:  Object to form and
5        foundation.  Same instruction.
6               THE WITNESS:  Based on advice of counsel,
7        I'll exercise my right under the Fifth Amendment to
8        not answer that question.
9  BY MR. WILHELM:
10 Q.    Sheila gets a little bit terse here because she's
11       kind of defending her employee and her own dignity,
12       if you will, and she says, "I can't blame them
13       because I would be on someone's ass that owed me
14       money since 2019," which was three years prior,
15       right, sir?
16              MS. REAGAN:  Object to form and
17       foundation.  Same instruction.
18              THE WITNESS:  Based on advice of counsel,
19       I'll exercise my right under the Fifth Amendment to
20       not answer that question.
21 BY MR. WILHELM:
22 Q.    So in conclusion, she says, "I didn't mean to make
23       any promises that I couldn't back up" -- which is
24       sort of interesting -- "but I figure that both of
25       you would agree that a bit more money would be

Page 267

1        better than my having to take every call that
2        wanted to speak with a supervisor."
3               So did you agree with paying Robin
4        Jakucenis more money to sort of appease her having
5        to deal with all these unpaid claims, sir?
6               MS. REAGAN:  Object to form and
7        foundation.  Same instruction.
8               THE WITNESS:  Based on advice of counsel,
9        I exercise my right under the Fifth Amendment to
10       not answer that question.
11              (Marked for identification:
12              Deposition Exhibit No. 24.)
13 BY MR. WILHELM:
14 Q.    I'll hand you what's been marked as Exhibit 24 and
15       ask you to take a look and let me know when you're
16       ready.
17 A.   Yes, sir.
18 Q.    Do you recognize this document, sir?
19 A.   It's an email from Daniel Barnes to Dave Obermeyer.
20 Q.    Okay.  And below that, Sheila Autry and Janie
21       Jackson forwarding to Dave Obermeyer and then
22       forwarding to Daniel Barnes at First Horizon,
23       right, sir?
24 A.   Yes.
25 Q.    So here Sheila is asking Janie about a check that

Page 268

1        for some reason provider is stating it didn't
2        receive.  It's check No. 238232 -- it's at the
3        bottom of page 2 -- for the amount of $617.52,
4        right, sir?
5  A.   That's what it says; yes, sir.
6  Q.    All right.  Do you know anything about checks that
7        were allegedly issued but didn't clear and a
8        pattern of that happening, sir?
9               MS. REAGAN:  Object to form.  Foundation.
10       I'll instruct the witness not to answer and assert
11       the Fifth Amendment.
12              THE WITNESS:  Based on the advice of
13       counsel, I'll assert my rights under the Fifth
14       Amendment and not answer that question.
15 BY MR. WILHELM:
16 Q.    And then above, Janie goes ahead and forwards it
17       to -- she forwards Sheila's inquiry to Dave
18       Obermeyer, your CFO.  "Can you have your contact at
19       the bank look into this one, please?" et cetera,
20       right, sir?
21 A.   That's correct.
22 Q.    And then Mr. Obermeyer provides the account number,
23       last four digits, right?
24 A.   Yes.
25 Q.    And in fact, just for reference, I'll show you a

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
269..272

Page 269

1    document I'll make an exhibit shortly, but this is
2    the Ciena FBO account that he's referencing, right,
3    sir?
4  **A.   Yes, sir.**
5  Q.   Ending in 0793, right?
6  **A.   Yes, sir.**
7              MR. WILHELM:  And for the record, I'm
8    showing the witness a bank statement on business
9    checking from First Horizon Bank, statement date
10   2-29-24.
11 BY MR. WILHELM:
12 Q.   Mr. Barnes responds to Mr. Obermeyer, "This is the
13   only item that came back with that check number,
14   but it's with different amounts."  Do you know what
15   that's all about, sir?
16             MS. REAGAN:  Object to form.  Foundation.
17   Instruct the witness not to answer and assert the
18   Fifth Amendment.
19             **THE WITNESS:  Based on the advice of**
20   **counsel, I'll assert my right under the Fifth**
21   **Amendment to not answer that question.**
22             (Marked for identification:
23             Deposition Exhibit No. 25.)
24 BY MR. WILHELM:
25 Q.   I'm handing you what's been marked as Exhibit 25.

Page 270

1    I'll ask you to take a look and let me know when
2    you're ready.
3              Do you recognize this document, sir?
4  **A.   Yes, sir.**
5  Q.   You recognize the questions and answers or you
6    might call it a FAQ pamphlet that's two pages at
7    the end of this exhibit?
8  **A.   Yes, sir, I do.**
9  Q.   In fact, at the top of that pamphlet it says it's
10   from you, Andy Willoughby, right?
11 **A.   Yes, sir, it does.**
12 Q.   Dated July 24, correct?
13 **A.   No, sir.**
14 Q.   Excuse me.  July 2024.  I misspoke.
15 **A.   That is correct, July 2024.**
16 Q.   And this is emailed to Ciena on July 29, 2024,
17   correct?
18 **A.   Yes, sir.**
19 Q.   From you, correct?
20 **A.   Yes, sir.**
21 Q.   At the top of that brochure, the first thing out of
22   the -- first thing on the top of the brochure says,
23   "In the spirit of full transparency," right, sir?
24 **A.   Yes, sir.**
25 Q.   Were you fully transparent with Ciena at this time

Page 271

1    on July 29, 2024?
2              MS. REAGAN:  Object to form.  Instruct
3    the witness not to answer and assert the Fifth
4    Amendment privilege.
5              **THE WITNESS:  Based on advice of counsel,**
6    **I assert my right under the Fifth Amendment to not**
7    **answer that question.**
8  BY MR. WILHELM:
9  Q.   On the second page of that document, second
10   paragraph, "Where does this investigation stand?"
11   It says, "The investigation is ongoing and the
12   situation remains fluid.  To protect the integrity
13   of this investigation, we have been advised to
14   avoid discussing details at this time."
15   Who advised you to not tell clients the
16   details that you knew about, sir?
17             MS. REAGAN:  Object to form.  Foundation.
18   I'll caution the witness to not reveal
19   attorney-client privilege and assert the Fifth
20   Amendment.
21             **THE WITNESS:  Based on the advice of**
22   **counsel, I'll assert my Fifth Amendment right and**
23   **not answer that question at this time.**
24 BY MR. WILHELM:
25 Q.   And then, "What are you doing to prevent this from

Page 272

1    happening again?"  This is what you wrote here,
2    which you presented to clients.  You said, "Working
3    with our CPAs and legal team, we are putting
4    processes and procedures in place to help ensure
5    we're never in this position again," right, sir?
6              MS. REAGAN:  Object to form.  Same
7    instruction.
8              **THE WITNESS:  Based on advice of counsel,**
9    **I'm exercising my Fifth Amendment right to not**
10   **answer that question.**
11 BY MR. WILHELM:
12 Q.   In fact, what you did plan was a looming bankruptcy
13   that you weren't telling anybody about, right, sir?
14             MS. REAGAN:  Object to form.  Foundation.
15   Instruct the witness to assert the Fifth Amendment
16   privilege.
17             **THE WITNESS:  Based on the advice of**
18   **counsel, I'll exercise my right under the Fifth**
19   **Amendment to not answer that question.**
20 BY MR. WILHELM:
21 Q.   A bankruptcy that you had already put together and
22   waited until Ciena sued you and filed the
23   bankruptcy three days later just moments before a
24   TRO deadline was due, right, sir?
25             MS. REAGAN:  Object to form and to the

Page 273

1 extent it misstates and mischaracterizes the
2 testimony or evidence in this case. I'll instruct
3 the witness not to answer and assert the Fifth
4 Amendment privilege.
5 **THE WITNESS: Based on the advice of**
6 **counsel, I'll exercise my Fifth Amendment right to**
7 **not answer that question.**
8 (Marked for identification:
9 Deposition Exhibit No. 26.)
10 BY MR. WILHELM:
11 Q. I'll hand you what's been marked as our next
12 exhibit, 26. I'll ask you to look at this and let
13 me know when you're ready.
14 **A. Yes, sir.**
15 Q. Do you recognize this document?
16 **A. It's collateral from Group Resources from either**
17 **our website or sales brochure.**
18 Q. Okay. Were you involved in the drafting of this
19 document or reviewing it?
20 **A. Yes, sir.**
21 Q. And do you believe it to be true and accurate from
22 your standpoint?
23 **A. I'm sorry, the last part of your question was? I'm**
24 **sorry, I was reading it.**
25 Q. Do you believe it to be true and accurate from your

Page 274

1 standpoint?
2 **A. Yes, sir, that was our goals, absolutely.**
3 Q. And just for the record, your website -- I took the
4 liberty of just pulling that up. It's still posted
5 on your website, right, sir? And feel free to take
6 a peek to make sure it's the same.
7 **A. Yes, sir.**
8 MR. WILHELM: For the record, that's
9 groupresources.com and it is under the tab "Medical
10 and Dental Claims Administration." It brings up
11 this document. Okay?
12 **THE WITNESS: Okay.**
13 MS. REAGAN: What was the tab?
14 MR. WILHELM: "Medical and Dental Claims
15 Administration.
16 (Marked for identification:
17 Deposition Exhibit No. 27.)
18 BY MR. WILHELM:
19 Q. All right. I'll have this marked as our next
20 exhibit, 27.
21 All right. Do you recognize this
22 document, sir?
23 **A. No, sir, I do not.**
24 Q. You recognize the bank, First Horizon, right?
25 **A. Yes.**

Page 275

1 Q. The company name, Obermeyer Wealth Management LLC?
2 **A. I've seen that name; yes, sir.**
3 Q. What is that?
4 **A. It was a company established by Dave Obermeyer.**
5 Q. Okay. And that address, 2120 Chicopee Mill Road,
6 that was a remote location at which he had his
7 Group Resources monitors and did work there on
8 behalf of Group Resources, right, sir?
9 MS. REAGAN: Object to form and
10 foundation.
11 **THE WITNESS: It was a location from**
12 **which he worked occasionally; yes, sir.**
13 BY MR. WILHELM:
14 Q. On behalf of Group Resources?
15 **A. When he was remote; yes, sir.**
16 Q. And you knew about that, right, sir?
17 MS. REAGAN: Object to form.
18 **THE WITNESS: That he was working?**
19 MR. WILHELM: That he was working there
20 on Chicopee Mill Road.
21 **THE WITNESS: Yes, sir.**
22 BY MR. WILHELM:
23 Q. For how long did he do that, like when did he start
24 working there, about what month?
25 **A. I don't recall.**

Page 276

1 MS. REAGAN: Object to form and
2 foundation.
3 BY MR. WILHELM:
4 Q. Was it pre-COVID?
5 **A. I don't believe so.**
6 Q. So more recent, like 2023 perhaps or 2022?
7 MS. REAGAN: Object to form. Asked and
8 answered.
9 **THE WITNESS: I don't recall.**
10 BY MR. WILHELM:
11 Q. You don't keep track of when your CFO starts
12 working in an industrial converted space from which
13 he allegedly stole 8.1 million from you and unknown
14 amounts from clients?
15 MS. REAGAN: Object to form. Foundation.
16 Argumentative, to the extent it mischaracterizes
17 testimony in evidence in this case.
18 **THE WITNESS: No, sir; I don't recall a**
19 **date.**
20 BY MR. WILHELM:
21 Q. Back to the exhibit, that account number ending in
22 5259, you've seen that account number before, as
23 far as you know?
24 **A. It's not a Group Resources account; I haven't seen**
25 **it there.**

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.                    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                                        277..280

Page 277

1  Q.   How do you know that?
2  A.   Because it does not appear in any list of Group
3       Resources accounts provided by First Horizon or in
4       the treasury management system.
5  Q.   How do you know that off the top of your head?  You
6       represented to us you have over 130 accounts
7       associated with Group Resources.  How do you know
8       that 5259 has never been associated with Group
9       Resources?
10 A.   There's not an account in that entire list that has
11      Obermeyer's name in it.
12 Q.   That's just a list that you chose to provide.
13           MS. REAGAN:  Object to form.
14           MR. WILHELM:  You've made that assertion.
15           MS. REAGAN:  Object to form.
16      Argumentative.
17           THE WITNESS:  In the treasury management
18      system I have available from First Horizon, there
19      is no account with Obermeyer's name available to
20      it.  That treasury management is from Group
21      Resources' account.
22 BY MR. WILHELM:
23 Q.   As of what date, sir, are you referring to?
24 A.   March 2024, when I obtained access.
25 Q.   How do you know that that four-digit account is not

Page 278

1       in the list of 130?  You had a hard time
2       remembering earlier today how many times you've
3       been deposed, a number of certain transactions and
4       so forth, and you can remember a four-digit code
5       out of a list of 130 account numbers?
6            MS. REAGAN:  Object to form to the extent
7       it misstates prior testimony of the witness and
8       argumentative.
9            THE WITNESS:  I know that the account
10      name is not on that list of 130 account numbers and
11      do not believe that it was ever listed under a --
12      that 5259 has ever appeared as an account number.
13 BY MR. WILHELM:
14 Q.   I'll hand you what's being marked -- or is
15      Exhibit 11 and ask you to look at the middle of the
16      page, the red highlights.  It's an exhibit we
17      looked at earlier.
18 A.   Uh-hum.
19 Q.   Read for me into the record the bottom of that list
20      of overdraft accounts and the four digits, please.
21 A.   5259.
22 Q.   5259; is that right, sir?
23 A.   Yes, sir.
24           MR. WILHELM:  It looks like a perfect
25      match.

Page 279

1            MS. REAGAN:  Object to form and
2       foundation.  Argumentative.  The witness was
3       instructed to not answer questions with regard to
4       this exhibit, asserting the Fifth Amendment
5       privilege.
6            MR. WILHELM:  So now you're invoking the
7       Fifth on this?
8            THE WITNESS:  I do not --
9            MS. REAGAN:  Go ahead.
10           THE WITNESS:  I invoked it earlier on
11      this document.
12           MR. WILHELM:  I'm just asking if this
13      matches what's on that document, and it does.  You
14      already testified that it does.
15           MS. REAGAN:  The documents speak for
16      themselves.  There's a "-5259" on Exhibit 11 and
17      Exhibit 27 has a bank account number that ends in
18      5259.
19 BY MR. WILHELM:
20 Q.   Is it your testimony, sir, that it's a different
21      account?
22 A.   With regard to this document, I'm exercising my
23      right under the Fifth Amendment to not answer the
24      question.
25           MR. WILHELM:  For the record, the witness

Page 280

1       is referring to Exhibit 11.
2            (Marked for identification:
3            Deposition Exhibit No. 28.)
4            MR. WILHELM:  Let me hand you what's been
5       marked as Exhibit 28.  And I don't think it's as
6       bad as it may seem, Mr. Willoughby.
7            Ms. Reagan, I think it's largely an
8       attachment -- a couple of attachments or a package
9       of attachments, so I just wanted to have you take a
10      peek at this.
11 BY MR. WILHELM:
12 Q.   After page 3 or 4 of this package, you'll see a
13      cover sheet that says, "Intact Insurance -
14      Management Liability - Primary," and it's a policy
15      for Group Resources Acquisitions.  Do you see that,
16      sir?
17 A.   Yes, sir.
18 Q.   From you to -- this is an email on the cover, would
19      you agree, from you to Dave Obermeyer, right, sir?
20 A.   Yes, sir.
21 Q.   Attaching at least four documents of a 2023 crime
22      policy, a final policy that's indicated as D&O, and
23      then a 2023 E&O primary policy package, do you see
24      that, and then a 2023 cyber policy?  Do you see all
25      four of those, sir, on the attachments?

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.    Job 34356
WILLOUGHBY, WILLIAM 10/22/2024                              281..284

Page 281

1 A.    Yes, sir.
2 Q.    So in the email exchanges between you and
3    Mr. Obermeyer, he's forwarding to you something
4    from the account manager, Wanda Jackson; do you see
5    that, sir?
6 A.    Yes, sir.
7 Q.    Mr. Obermeyer says to you on March 21, near the
8    bottom of page 1, "I'm going through this to make
9    changes accordingly.  I am deleting Dallas.  Can I
10    delete Scottsdale as well?"  He re-ups it to you on
11    Friday the 24th and you respond to him on the 24th
12    saying, "Thanks for sending that.  It does make it
13    easier to answer."  Do you know what you're
14    answering about there?
15 A.    Yes, sir.  Epic was brokers on certain of our lines
16    of coverages and was asking us about who wanted
17    other coverage.
18 Q.    I see.  So you said, "I know the D&O and employment
19    practices are covered through the D&O policy.  We
20    have a separate cyber policy with DECUS."  Do you
21    see that?
22 A.    Uh-hum.
23 Q.    "We have a crime policy through Intact that I think
24    covers all of that," right, sir?
25 A.    Yes, sir.

Page 282

1 Q.    And then you say, "I don't know about fiduciary
2    liability though.  It is not specifically covered
3    by the crime policy."
4        What ended up being your response
5    regarding fiduciary liability?  Did you end up
6    getting a policy, if you know?
7 A.    I don't recall.
8 Q.    Maybe you did, maybe you didn't?
9 A.    I don't recall.
10 Q.    Then you say to Mr. Obermeyer, "And I don't see it
11    in the D&O.  I've included all policies.  Will you
12    see if you see it anywhere?"  You're referring to
13    fiduciary liability, right, sir?
14 A.    I believe so; yes, sir.
15 Q.    Do you remember if he ever responded?
16 A.    I don't recall.
17 Q.    This is an exhibit that I'm not going to re-enter
18    because it's already -- I will state for the record
19    it's already Exhibit 6 to your deposition, I
20    believe -- and if our court reporter can please
21    confirm that at her convenience.  We can correct
22    the record if necessary, but I believe it's
23    Exhibit 6.
24        On this document, because of the length
25    of -- it's about 491 pages -- actually it is 491,

Page 283

1    you'll see in the branding at the bottom.  I'll ask
2    if counsel can look along with you as needed.  I
3    think we can go by date here.  And for the record
4    again, this is texts that you produced between
5    yourself and Mr. Obermeyer and I wanted to ask you
6    about a couple of them at least.
7        All right.  So let's go to page 430.  I'm
8    sorry, page 423.  There's a note from -- hang on
9    one second.
10        I'm assuming the blue bubbles are from you
11    and the gray are from Mr. Obermeyer in this entire
12    document, right, sir?
13 A.    Yes, sir; I believe that's the case.
14 Q.    Okay.  In the middle, on August 3rd, you say to
15    Mr. Obermeyer, "116,000 from Ciena came in."
16    $116,000 from Ciena came in.  Do you know what
17    that's referring to, sir?
18        MS. REAGAN:  Object to form and
19    foundation and instruct the witness not to answer
20    and assert the Fifth Amendment.
21        THE WITNESS:  Based on advice of counsel,
22    I'll exercise my right under the Fifth Amendment to
23    not answer that question.
24 BY MR. WILHELM:
25 Q.    And you respond -- you then followed up and said,

Page 284

1    "Can I send the 146,000 to Script Care for delivery
2    tomorrow?"  This is like four minutes after you
3    sent him the money about -- the text about the
4    money coming in from Ciena, right, sir?
5        MS. REAGAN:  Same objection.  Same
6    instruction.
7        THE WITNESS:  Based on the advice of
8    counsel, I exercise my right under the Fifth
9    Amendment to not answer that question.
10 BY MR. WILHELM:
11 Q.    Okay.  Page 429, sir.  Bottom of the page.
12        By the way, how was your relationship with
13    Tom Byrd at this time in August of 2023?
14        MS. REAGAN:  Object to form.
15        THE WITNESS:  It was okay.  It was okay.
16 BY MR. WILHELM:
17 Q.    It had been better in the past?
18        MS. REAGAN:  Is there a question?  I
19    didn't hear a question.
20        MR. WILHELM:  It had been better in the
21    past?
22        MS. REAGAN:  Object to form.
23        THE WITNESS:  Yes, sir.
24 BY MR. WILHELM:
25 Q.    Any particular reason why it had declined?

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
285..288

---

Page 285

1 A.   Just the passage of time.  He had sold the business
2      five years prior.
3 Q.   And he tried to continue to meddle in it from your
4      standpoint?
5           MS. REAGAN:  Object to form.
6 BY MR. WILHELM:
7 Q.   He tried to show up to meetings that he didn't
8      necessarily need to be at, right, sir?
9           MS. REAGAN:  Object to form.
10          THE WITNESS:  He wanted to be more
11      involved than he was and should be.
12 BY MR. WILHELM:
13 Q.   Okay.  He still had a sense that he ran the show?
14          MS. REAGAN:  Object to form and
15      foundation.
16          THE WITNESS:  I can't speak to that,
17      but...
18          MR. WILHELM:  At the bottom of this
19      page --
20          MS. REAGAN:  Which page are we on?  I'm
21      sorry.
22          MR. WILHELM:  429.
23          MS. REAGAN:  Okay.
24 BY MR. WILHELM:
25 Q.   "I sent you a note on the taxes for TB."  That's

---

Page 286

1      Thomas Byrd, Thomas S. Byrd, right, sir?
2 A.   Yes, sir.
3 Q.   And then below that, you tell him, "Three Ciena
4      checks totaling $154,000 came in."  Do you see
5      that, sir?
6 A.   Yes.
7 Q.   What was the purpose in your telling Mr. Obermeyer
8      that at that time?
9           MS. REAGAN:  Object to form and instruct
10      the witness to assert the Fifth Amendment.
11          THE WITNESS:  Based on the advice of
12      counsel, I'll assert my Fifth Amendment right to
13      not answer that question.
14 BY MR. WILHELM:
15 Q.   433, September 7, at the top of the page.
16      "$147,000 from Ciena.  I'm going to release the
17      $114,000 file I have been holding, okay?"  Is that
18      what you wrote, sir?
19 A.   That's what it says there; yes, sir.
20 Q.   Okay.  Why were you telling Mr. Obermeyer that at
21      the time?
22          MS. REAGAN:  Object to form and instruct
23      the witness to assert the Fifth Amendment.
24          THE WITNESS:  Based on advice of counsel,
25      I exercise my right under the Fifth Amendment to

---

Page 287

1      not answer that question.
2 BY MR. WILHELM:
3 Q.   And then Obermeyer asks you, "Okay.  Is more coming
4      tomorrow?"  You then respond, "Yes, I think 100 or
5      150."  You mean thousand, correct, sir?
6           MS. REAGAN:  Same objection, same
7      instruction.
8           THE WITNESS:  Based on the advice of
9      counsel, I will exercise my Fifth Amendment to not
10      answer that question.
11 BY MR. WILHELM:
12 Q.   Well, in fact, the next bubble says, "Received
13      $102,000 from Ciena just now," correct?
14 A.   That is what it says.
15 Q.   All right.  Why were you telling Obermeyer about
16      those amounts coming in at that time, sir?
17          MS. REAGAN:  Same objection.  Same
18      instruction.
19          THE WITNESS:  Based on the advice of
20      counsel, I exercise my right under the Fifth
21      Amendment to not answer that question.
22 BY MR. WILHELM:
23 Q.   Next page, September 14, you asked Obermeyer,
24      second bubble, "Have we paid the rent yet for
25      September?  Phil has emailed me about it," right,

---

Page 288

1      sir?
2 A.   Yes, sir.
3 Q.   Who is Phil in that bubble?
4 A.   Phil Weener.
5 Q.   Why is Phil Weener emailing you about paying rent?
6 A.   At that point he --
7           MS. REAGAN:  I'll just caution you not
8      to reveal attorney-client privileged
9      communications.
10          THE WITNESS:  Yes, ma'am.
11          MS. REAGAN:  To the extent that you can
12      answer the question without doing that, please
13      proceed.
14          THE WITNESS:  Thank you.  He was part of
15      the ownership group of the building that -- the
16      company we leased the building from at that point.
17 BY MR. WILHELM:
18 Q.   Did that ever change?
19 A.   Yes.
20 Q.   When?  Because this was just a year ago.
21 A.   They sold at some point in 2024.
22 Q.   I'm sorry, what?
23 A.   It sold at some point in 2024.
24 Q.   That group sold the building?
25 A.   Yes, sir.

---

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
289..292

---

Page 289

1  Q.   Who are the landlords now, or the owner?
2  **A.   Eastern Investments.**
3  Q.   Is anyone at Weener Nathan Phillips involved with
4       that, with that entity?
5  **A.   Not to my knowledge.**
6  Q.   Do you owe either landlord any money nowadays?
7       Group Resources, that is.  Either the prior
8       landlord or the current one.
9  **A.   The landlord is a creditor in the bankruptcy.**
10 Q.   Do you know how much?
11 **A.   No, sir, I do not.**
12 Q.   When Mr. Weener and his group sold the building to
13      the current landlord, did they know that you might
14      be filing bankruptcy?
15      MS. REAGAN:  Object to form.  Foundation.
16      **THE WITNESS:  I don't know.**
17 BY MR. WILHELM:
18 Q.   What was the date of the sale?
19 **A.   It was sometime in 2024.  I don't recall.**
20 Q.   After you fired Obermeyer allegedly?
21      MS. REAGAN:  Object to form and
22      characterization.
23      **THE WITNESS:  It was after Obermeyer was**
24      **terminated.**
25      MR. WILHELM:  Okay.  I thought so.

---

Page 290

1  BY MR. WILHELM:
2  Q.   On September 28, 2023, page 441, please.  Do you
3       see the image from Mr. Obermeyer to you of a
4       laptop?
5  **A.   Yes, sir.**
6  Q.   Is that his Group Resources laptop?
7       MS. REAGAN:  Object to form.  Foundation.
8       **THE WITNESS:  I don't know.**
9  BY MR. WILHELM:
10 Q.   Has he returned his Group Resources laptop?
11 **A.   He has not.**
12 Q.   When is the last time you asked for it?
13 **A.   I don't recall.**
14 Q.   Would you have a problem asking him for it now?
15 **A.   I'll discuss it with counsel, but I don't believe**
16 **so.**
17 Q.   The image on page 441 and then on 442, there's
18      three images that appear to be from David
19      Obermeyer, right?
20 **A.   Yes.**
21 Q.   Is that from his remote office location?
22      MS. REAGAN:  Object to form.  Foundation.
23      **THE WITNESS:  I believe so.**
24 BY MR. WILHELM:
25 Q.   At 2120 Chicopee Mill Road?

---

Page 291

1       MS. REAGAN:  Object to form and
2  foundation.
3       **THE WITNESS:  Yes, sir.**
4  BY MR. WILHELM:
5  Q.   This thing at the bottom, he says -- it's a big
6       screen, takes a picture of it, sends to you.  "Got
7       this big screen by mistake," and then he's got an
8       emoji of a smile with tears of laughter after it.
9       Do you know why he's saying that, sir?
10 **A.   I do not.**
11 Q.   How does one get a big screen TV by mistake?
12      MS. REAGAN:  Object to form and
13      foundation.
14      **THE WITNESS:  I don't know.**
15 BY MR. WILHELM:
16 Q.   Well, you responded there saying "Ha!"  So did you
17      know about how he paid for that big screen?
18 **A.   No.**
19 Q.   This is on page 443, you respond "Ha!!"
20 **A.   I see it.  I don't know.**
21 Q.   You don't know what?
22 **A.   How he paid for that big screen.**
23 Q.   But you just -- you didn't really care, right?  You
24      just responded Ha!!"  Right, sir?
25      MS. REAGAN:  Object to form and the

---

Page 292

1  characterization of the document and the witness'
2  testimony.
3       **THE WITNESS:  I was laughing at his**
4  **comment.**
5  BY MR. WILHELM:
6  Q.   He's your CFO with a remote office allegedly by
7       this time stealing millions from you and when he
8       told you he got a big screen TV by mistake, your
9       only response to him was "Ha!!"?
10      MS. REAGAN:  Object to form.
11      Argumentative.  To the extent it misstates testimony
12      in evidence in this case.
13      MR. WILHELM:  It doesn't, but go ahead.
14      **THE WITNESS:  There was no knowledge he**
15      **had been stealing from us in September of 2023.**
16 BY MR. WILHELM:
17 Q.   Your response, sir -- that's not my question.  My
18      question is, your only response to him is to laugh?
19 **A.   I laughed at his comment; yes, sir.**
20 Q.   And you didn't think to check into it and see,
21      "Gosh, I wonder what he meant by that or how he
22      paid for it or how he stole to get it"?  You didn't
23      think to ask?
24      MS. REAGAN:  Object to form.
25      Argumentative.

---

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.        Job 34356
WILLOUGHBY, WILLIAM 10/22/2024        293..296

Page 293

1          THE WITNESS:  No, sir; I did not.
2 BY MR. WILHELM:
3 Q.   443, four bubbles down, "$160,000 from Ciena came
4      in.  I will be releasing against that this
5      afternoon," right, sir?
6 A.   That's what it says; yes, sir.
7 Q.   And this is on September 29, 2023.  Did this mean
8      you would be releasing a variety of, up until that
9      point, unpaid claims against that money that just
10     came in that afternoon?
11          MS. REAGAN:  Object to form.  Instruct
12     the witness not to answer and assert the Fifth.
13          THE WITNESS:  Based on the advice of
14     counsel, I assert my Fifth Amendment right to not
15     answer that question.
16 BY MR. WILHELM:
17 Q.   Next page, middle of the page, October 5, "$169,000
18     came in from Ciena.  Octavia is off half day and
19     Janie is remote.  Is there a way I can deposit it
20     or can it wait until tomorrow?" right, sir?
21 A.   Yes, sir.
22 Q.   These are plan funds, right, sir?
23          MS. REAGAN:  Object to form and instruct
24     the witness to assert the Fifth.
25          THE WITNESS:  Based on the advice of

Page 294

1      counsel, I assert my Fifth Amendment right to not
2      answer that question.
3 BY MR. WILHELM:
4 Q.   Dave responds to you, "It can wait until tomorrow,"
5      right, sir?
6 A.   That's what it says.
7 Q.   October 12, page 445, you write to Obermeyer, "Hope
8      your day is going well.  Ignoring the money
9      received yesterday, I have $117,000 to release
10     against the $179,000" -- and I'm paraphrasing based
11     on context -- "received on Tuesday.  Is that okay?"
12     He responds, "Okay," correct?
13 A.   That is what it says.
14 Q.   All right.  And why are you telling Obermeyer about
15     the money received yesterday and then $179,000
16     received on Tuesday at that time?
17          MS. REAGAN:  Object to form and instruct
18     the witness to assert the Fifth Amendment
19     privilege.
20          THE WITNESS:  Based on the advice of
21     counsel, I'll assert my Fifth Amendment right to
22     not answer that question.
23 BY MR. WILHELM:
24 Q.   Those are plan funds, right, sir?
25          MS. REAGAN:  Same objection.  Same

Page 295

1      instruction.
2          THE WITNESS:  Based on the advice of
3      counsel, I'll assert my right to not answer that
4      question under the Fifth Amendment.
5 BY MR. WILHELM:
6 Q.   And you've determined at this time that you have
7      $117,000 to release against unpaid plan claims at
8      that time, right, sir?
9          MS. REAGAN:  Same objection.  Same
10     instruction.
11          THE WITNESS:  Based on the advice of
12     counsel, I'll assert my right under the Fifth
13     Amendment to not answer that question.
14 BY MR. WILHELM:
15 Q.   And then you asked Obermeyer for his approval or
16     his signoff and he gave you the approval or the
17     signoff, right, sir?
18          MS. REAGAN:  Same objection.  Same
19     instruction.
20          THE WITNESS:  Based on the advice of
21     counsel, I'll assert my Fifth Amendment right to
22     not answer that question.
23 BY MR. WILHELM:
24 Q.   Page 448, October 13, 2023, "The pruning work looks
25     nice."  And then below that -- this is from you to

Page 296

1      Obermeyer.
2 A.   448?
3 Q.   448.
4 A.   Okay.  Bottom.  Sorry.
5 Q.   At the bottom.
6          Below that, you write to Obermeyer, "We
7      received 101" -- I assume $101,000 -- "from Ciena
8      today.  I'll send a file with $117,000 to Donna
9      after 11:00 on Monday."  That's what you wrote,
10     right, sir?
11 A.   That's what it says; yes, sir.
12 Q.   And those were plan funds, right, sir?
13          MS. REAGAN:  Object to form and instruct
14     the witness not to answer and assert the Fifth
15     Amendment.
16          THE WITNESS:  Based on the advice of
17     counsel, I'm asserting my right under the Fifth
18     Amendment to not answer that question.
19 BY MR. WILHELM:
20 Q.   And the $117,000 at that time was payment to be
21     issued for, until that time, unpaid claims, right,
22     sir?
23          MS. REAGAN:  Same objection.  Same
24     instruction.
25          THE WITNESS:  Based on the advice of

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
297..300

---

Page 297

1      counsel, I'll assert my right under the Fifth
2      Amendment to not answer that question.
3  BY MR. WILHELM:
4  Q.   Page 455, October 26 -- I'll combine these.
5      "$102,000 from Ciena, gave to Octavia." So you
6      gave that money to Octavia, right, sir?
7          MS. REAGAN:  Object to form and instruct
8      the witness not to answer and assert his Fifth
9      Amendment privilege.
10         THE WITNESS:  Based on the advice of
11     counsel, I'll assert my rights under the Fifth
12     Amendment to not answer that question.
13 BY MR. WILHELM:
14 Q.   Those were plan funds, right, sir?
15         MS. REAGAN:  Same objection.  Same
16     instruction.
17         THE WITNESS:  Based on the advice of
18     counsel, I'll assert my right under the Fifth
19     Amendment to not answer that question.
20 BY MR. WILHELM:
21 Q.   The next day, "$203,000 from Ciena today," right,
22     sir?
23         MS. REAGAN:  Same objection.  Same
24     instruction.
25         THE WITNESS:  Based on the advice of

---

Page 298

1      counsel, I'll assert my right to not answer that
2      question and exercise my Fifth Amendment right.
3  BY MR. WILHELM:
4  Q.   You asked Obermeyer in that same text, "How is
5      South Beach?" right?
6  A.   Yes, sir.
7  Q.   He sent you a picture on the next page; do you
8      see?  What was he doing at South Beach at that
9      time, sir?
10         MS. REAGAN:  Object to form.  Foundation.
11         THE WITNESS:  I believe he was on
12     vacation.
13 BY MR. WILHELM:
14 Q.   How much did he make per year in salary?
15 A.   I believe 110,000.
16 Q.   Did he take a lot of vacations in the last five
17     years?
18 A.   Not particularly; no, sir.
19 Q.   Would you actually know if he did though?
20 A.   I would know what he told me only.
21 Q.   On 459, November 2, 2023, picture of what appears
22     to be a jet-ski, a watercraft, whatever you want to
23     call it.  What's the best name for that?
24 A.   Jet-ski.
25 Q.   WaveRunner?

---

Page 299

1  A.   Jet-ski.
2  Q.   Yeah.  So that's from Obermeyer to you, says, "One
3      toy off the lake."  Do you know how he paid for the
4      jet-ski?
5  A.   I did not at that time.
6  Q.   Okay.  Do you know now?
7  A.   Yes, sir.
8  Q.   And how was that?
9  A.   He was making payments for it using Group Resources
10     funds.
11 Q.   461.  There's a Ford truck and what appears to be a
12     pontoon recreational boat.  Whose vehicles are
13     those?
14 A.   Those are Dave Obermeyer's.
15 Q.   Did you know how he paid for those then?
16         MS. REAGAN:  Object to form.  Foundation.
17         THE WITNESS:  I did not at the time.
18 BY MR. WILHELM:
19 Q.   Do you know now?
20 A.   I believe he paid for some payments for both of
21     those vehicles with Group Resources funds.
22 Q.   Do you know how much total he spent on vehicles out
23     of Group Resources' money or client money?
24 A.   I do not.
25 Q.   464, towards the top.  November 13, 2023.  "On the

---

Page 300

1      Ciena front" -- this is you to Obermeyer -- "so far
2      I've released 95 of the 400 released last week."
3      Is that dollars or claims?
4          MS. REAGAN:  Object to form and instruct
5      the witness not to answer and assert the Fifth
6      Amendment privilege.
7          THE WITNESS:  Based on the advice of
8      counsel, I'll assert my right under the Fifth
9      Amendment not to answer that question.
10 BY MR. WILHELM:
11 Q.   "We'll be sending another 75 to Donna today."
12     That's Donna who, please?
13 A.   Donna Chambers.
14 Q.   Who is she, please?
15 A.   She worked at Group Resources.
16 Q.   Okay.  And what did that -- what was her job?
17 A.   She was involved in several areas with specific
18     reimbursements, claim reimbursements and releasing
19     of checks.
20 Q.   Okay.  Including for Ciena?
21 A.   For many clients; yes, sir.
22 Q.   Including Ciena?
23         MS. REAGAN:  Object to form.  Instruct
24     the witness not to answer and assert the Fifth
25     Amendment.

---

CIENA HEALTHCARE MANAGEMENT v GROUP RESOURCES INC.
WILLOUGHBY, WILLIAM 10/22/2024

Job 34356
301..304

---

Page 301

1        THE WITNESS:  Based on the advice of
2    counsel, I will not answer that question, asserting
3    my Fifth Amendment right.
4 BY MR. WILHELM:
5 Q.    "Need to send 103" -- Is that claims or thousand
6    dollars? -- "to SCL tomorrow or Wednesday"?
7        MS. REAGAN:  Same objection.  Same
8    instruction.
9        THE WITNESS:  Based on the advice of
10    counsel, I'll assert my Fifth Amendment right not
11    to answer that question.
12 BY MR. WILHELM:
13 Q.   You say, "Have another 60 after that, but at
14    holding for the next receipt.  Will that work?"
15    And Obermeyer responds, "More or less," right,
16    sir?
17 A.   That is what it says.
18 Q.   And then below, you say, "Substitute 'am' for 'at'
19    in the last sentence," so you meant to say, "But am
20    holding for the next receipt," correct, sir?
21 A.   That is what that says; yes, sir.
22 Q.   Page 465, two bubbles from the top, second bubble
23    says, "I have spoken with Kaplin this morning."
24    That's Jeff Kaplin, your accountant?
25 A.   Yes, sir.

Page 302

1 Q.   He says, "I was just" -- Obermeyer says, "I was
2    just fixing to email him in detail what that was
3    and how we plan to use that money."  Do you know
4    what he's referring to there?
5        MS. REAGAN:  Object to form.  Foundation.
6    Instruct the witness not to answer and assert the
7    Fifth Amendment.
8        THE WITNESS:  Based on the advice of
9    counsel, I'll exercise my Fifth Amendment right to
10    not answer that question.
11 BY MR. WILHELM:
12 Q.   Next page, 466, please.  In the middle of the page
13    there's an image from Obermeyer of what appears to
14    be a computer monitor and a list of files pulled
15    up in the middle of the screen.  Do you see that,
16    sir?
17 A.   Yes, sir.
18 Q.   And is this Dave Obermeyer's remote location with
19    nice wood floors or luxury vinyl and old industrial
20    brick around it?
21        MS. REAGAN:  Object to form.  Foundation.
22        MR. WILHELM:  Go ahead.
23        THE WITNESS:  I can't speak to the office
24    flooring or walls, but that is apparently a picture
25    of the computer in his office.

Page 303

1 BY MR. WILHELM:
2 Q.   Would you agree with me those are bricks as to the
3    walls?
4 A.   They appear to be bricks; yes, sir.
5 Q.   And the floor is a wood or wood alternative?
6 A.   I can't --
7        MS. REAGAN:  Object to form.  Foundation.
8        THE WITNESS:  I can't tell from this
9    photo what it is.
10 BY MR. WILHELM:
11 Q.   It's not carpet, correct?
12 A.   I don't know.
13 Q.   Okay.
14 A.   I don't know.
15 Q.   Somebody with better eyesight can probably see
16    that?
17 A.   Maybe.
18 Q.   But this is his Group Resources computer monitor,
19    right, sir?
20        MS. REAGAN:  Object to form.  Foundation.
21        THE WITNESS:  Yes, sir.
22 BY MR. WILHELM:
23 Q.   All right.  And in fact, he says, "Got my monitor
24    working.  I may buy myself one for the office and
25    give up the two screens."  So he means like his

Page 304

1    other office at Duluth at Group Resources?
2 A.   Yes, sir.
3        MR. WILHELM:  Okay.
4        MS. REAGAN:  Object to form and
5    foundation.
6 BY MR. WILHELM:
7 Q.   Page 468, top of the text chain, December 11, 2023,
8    "There should be $800,000 coming from Ciena
9    tomorrow.  We've been asked to hold depositing it
10    until December 15, please," and Obermeyer says,
11    "Okay," right?
12 A.   Yes, sir.
13 Q.   Do you understand why you're telling Obermeyer
14    about that $800,000 at that time, sir?
15        MS. REAGAN:  Object to form and instruct
16    the witness to assert the Fifth Amendment.
17        THE WITNESS:  Based on the advice of
18    counsel, I'll exercise my right under the Fifth
19    Amendment to not answer that question.
20 BY MR. WILHELM:
21 Q.   And in fact, Obermeyer replies to you saying, "We
22    just got in about $336,000" -- and I'm correcting a
23    typo here -- "Should we go and deposit that?"  And
24    you respond, "Yes, please," right, sir?
25        MS. REAGAN:  Object to form.  Instruct

---

# EXHIBIT "C"

[Engagement Letter]

# B|RILEY®
## *Advisory Services*

3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Tel: (470) 346-6800
www.brileyfin.com

November 4, 2024

W. Andrew Willoughby, CEO and President
Group Resources Acquisitions LLC;
Group Resources of Iowa LLC;
Group Resources Incorporated;
Employee Benefits Concepts Inc.
257 Breckenridge Boulevard Suite 300 Duluth, GA 30097
andy@groupresources.com

Re: Group Resources Inc. *et al.;* jointly administered under Chapter 11 Case No. 24-59671-SMS (the "Matter"), United States Bankruptcy Court, Northern District of Georgia, Atlanta Divisions (the "Bankruptcy Court")

Dear Andy:

This engagement letter (this "Agreement") confirms our understanding that Group Resources Acquisitions LLC and its undersigned affiliates (collectively, "Group Resources" or "Client" or "you") are engaging GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services ("we," "us," "our" or "B. Riley") as Chief Restructuring Officer ("CRO") and forensic accountant regarding the Matter.

Marshall Glade will act as CRO, have overall engagement planning responsibilities, and lead our day-to-day activities. Mr. Glade will also assign other professionals to the Matter as needed.

## Scope of Services

We understand that we are being retained to provide a CRO and provide forensic accounting services in connection with the Matter. Although matters such as this are dynamic, and the services provided may change as the Client provides additional information and/or as we learn additional information in the course of our engagement and as we fulfill the directives of any order of the Bankruptcy Court governing our retention and our duties, it is our understanding that the current Scope of Services may include the following:

- consulting on all aspects of the Client's business activities and operations, including budgeting, cash management, and financial management;

- serving as a signor on all bank accounts, with the ability to open and close bank accounts;

- evaluating liquidity position and ability to pay post-petition claims;

- attending hearings, providing information and analyses for inclusion in Bankruptcy court filings, and giving testimony related thereto;

- supporting negotiations or engaging in with the creditors and other constituents in the Bankruptcy Case;

**B | RILEY** *Advisory Services*

- operating the Client's business during the Bankruptcy Case, including winding-down the business;

- supervising B. Riley's preparation of monthly financial reports as required of a debtor in possession and other financial reporting required by the Office of the United States Trustee on behalf of a debtor in possession;

- working with the Client and its professionals to maximize the value of the Client's estate;

- If required, developing a plan to sell some or all of the Client's assets and/or to reorganize the Client;

- pursuing litigation and claims the estate may have; and

- acting as the responsible party for all corporate decisions.

## Bankruptcy

Marshall Glade's retention as CRO and B. Riley's retention as forensic accountant, on the terms set forth in this Agreement, will be subject to Bankruptcy Court approval.

## Compensation

We bill our professional time according to the number of hours worked at our standard hourly billing rates plus out-of-pocket costs incurred.

Our hourly rates for the individuals we anticipate using on this project are as follows:

> Marshall Glade, Managing Director… …...................…$550
> Laura Clemente, Associate Director…......................…$385
> Other …………………………………………………$250 - $600

B. Riley reviews its hourly rates each January 1, and the Client should anticipate an annual rate increase on January 1 and annually thereafter should the engagement still be active at that time. We will bill one-half of incurred travel time. Our fees are not contingent on the outcome of the Matter.

B. Riley will be retained in the Bankruptcy Case, and its monthly fees will be paid in accordance with the applicable federal and local statutes, rules, and procedures and the Bankruptcy Court's orders.

## Retainer

In accordance with B. Riley's standard policy, we will require a retainer of $50,000, which is due upon the approval of this Agreement by the Bankruptcy Court and, to the extent actually received by B. Riley, will be applied to our final billing for the Matter Client ("Retainer"). This Retainer is not intended to be an estimate for the total cost of work that may be performed, nor have we provided

**B | RILEY** *Advisory Services*

a binding estimate or other form of cap. The Client recognizes that it is difficult to estimate the amount of time that this engagement may require. The time involved depends upon the extent and nature of available information. It also depends upon the developments that occur as our work progresses.  Should the time demand increase, we may require an addition to our Retainer.

## Limitations

B. Riley is not a public accounting firm. While our work may involve analysis of accounting records, the engagement does not include an audit or review of existing records in accordance with generally accepted auditing standards or standards for review engagements. Accordingly, we will not be expressing an audit opinion on any of the financial or other data received in this engagement. B. Riley is not a law firm and will not provide legal or tax advice on any transaction or financing in conjunction with this assignment.

The working papers and other materials created by us during this engagement are our property. At the completion of our engagement, all of the Client's documents will be returned to the Client at the Client's request. Unless we are notified otherwise, or unless the Client requests the files to be returned to the Client, we assume that all documents in our possession may be destroyed one year from the completion of the Matter, or the passage of one year without our actively participating in the Matter. The Client acknowledges that all advice (written or oral) given by B. Riley to the Client is intended solely for the benefit and use of the Client (limited to the shareholders of the Client, its board of directors, and its management). Unless otherwise required or appropriate in connection with the Bankruptcy Case, no advice (written or oral) of B. Riley hereunder shall be used, reproduced, disseminated, quoted or referred to at any time, in any manner, or for any purpose, nor shall any public references to B. Riley be made by the Client without the prior written consent of B. Riley.

Please note that it is not our practice to retain working papers, notes, or data files that have been updated or superseded. If you wish us to follow a different retention practice, please indicate your specific request(s) in writing when returning a copy of this Agreement.

## Independent Contractor; No Fiduciary Duty

The Client acknowledges and agrees that (i) it is a sophisticated business enterprise, and that B. Riley has been retained pursuant to this Agreement and is not an agent or fiduciary to the shareholders of Client, and (ii) any duties of B. Riley arising out of this engagement shall be contractual in nature and shall be owed solely to the Client. Except as otherwise expressly provided by applicable law, each party to this Agreement disclaims any intention to impose any fiduciary duty on the other.

## Indemnification and Limitation of Liability

The Client agrees (i) to the indemnification and other agreements set forth on **Schedule A** hereto, which is hereby incorporated by reference, or (ii) to indemnify the Indemnified Parties (as defined on Schedule A) to the same extent as the most favorable indemnification it extends to its officers

**B | RILEY** *Advisory Services*

or directors, whether under the Client's bylaws, its certificate of incorporation, or otherwise, whichever is greater. The Client further agrees that no reduction or termination in any of the benefits provided under any such indemnities described in subsection (ii) of the preceding section shall affect the benefits provided to Indemnified Parties.

THE CLIENT ALSO AGREES THAT NO INDEMNIFIED PARTY SHALL HAVE ANY LIABILITY (WHETHER DIRECT OR INDIRECT, IN CONTRACT OR TORT OR OTHERWISE) TO THE CLIENT FOR OR IN CONNECTION WITH THE ENGAGEMENT OF B. RILEY, IN EXCESS OF THE FEES PAID TO B. RILEY HEREUNDER, INCLUDING ANY REASONABLE ATTORNEYS' FEES AND COURT COSTS, EXCEPT TO THE EXTENT THAT ANY SUCH LIABILITY FOR LOSSES, CLAIMS, DAMAGES, LIABILITIES OR EXPENSES IS FINALLY JUDICIALLY DETERMINED OR DETERMINED PURSUANT TO A FINAL, BINDING DECISION OF AN ARBITRATOR IN ACCORDANCE WITH THE DISPUTE RESOLUTION PROVISIONS OF THIS AGREEMENT TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

## Insurance

During the term of this Agreement and for a one-year period following its termination (the "Covered Period"), the Client shall specifically include and cover B. Riley's employees and agents serving as directors and officers (such as a CRO) of the Client or its affiliates (collectively, the "Covered Parties") from time to time with direct coverage under the Client's existing director and officer liability insurance policies and any equivalently placed employee liability insurance policies (collectively, the "D&O Policy") and, in the event that the D&O Policy lapses, terminates, is non-renewed or canceled during the Covered Period, the Client shall seek to replace the D&O Policy with like coverage at Client's expense or B. Riley may replace the D&O Policy with like coverage at Client's expense. Prior to B. Riley personnel or agents accepting any director or officer position, the Client shall provide evidence of said coverage in place and evidence of payment of premiums associated therewith, as well as any board resolutions and documents that B. Riley may reasonably request evidencing the appointment and coverage of the Covered Parties. The D&O Policy must be at a coverage level satisfactory to B. Riley in its sole discretion. The cost of any additional coverage shall be paid directly by the Client.

Notwithstanding anything to the contrary, the Client's indemnification, contribution, and advancement obligations in this Agreement shall be primary to (and without allocation against) any similar indemnification, contribution, and advancement obligations of B. Riley, its affiliates, and its insurers to the Covered Parties (which shall be secondary), and the Client's insurance coverage for the Covered Parties under the D&O Policy shall be specifically primary to (and without allocation against) any other valid and collectible insurance coverage that may apply to the Covered Parties (whether provided by B. Riley or otherwise).

## Termination

This Agreement may be terminated immediately by B. Riley or the Client, in their sole discretion, for any reason whatsoever and without prior notice. Upon termination of this Agreement, B. Riley

**B | RILEY** *Advisory Services*

shall be entitled to all fees and expenses incurred pursuant to this Agreement prior to notice of termination, subject to any dispute concerning the fees due and the dispute provision included in this Agreement and approval by the Bankruptcy Court. The termination of this Agreement shall not relieve the Client or B. Riley from the provisions of this Agreement relating to indemnification, limitation of liability, settlement, the payment of the fees, costs and expenses payable hereunder whether or not accrued prior thereto, confidentiality, the status of B. Riley as an independent contractor, the limitation on the use, reliance on, and disclosure of B. Riley's advice, governing law and dispute resolution, subject to approvals of the Bankruptcy Court in instances of payment of fees, costs, and expenses.

## Confidentiality

B. Riley agrees not to disclose or permit the disclosure of any of the terms of this Agreement or any information relating to the Matter, provided that such disclosure may be made (a) to any person who is an officer, director, member, manager, advisor, or employee of B. Riley or its affiliates ("Representatives") solely for their use in the performance of the services hereunder and on a need-to-know basis, (b) with the prior written consent of the Client, or (c) pursuant to law, regulation, subpoena, order issued by a court, arbitrator or governmental body, agency or official, or other legal process. In the event that B. Riley shall receive a request to disclose any of the terms of this Agreement pursuant to section (c) of the preceding sentence, B. Riley shall, to the extent legally permissible, (i) promptly notify the Client, (ii) consult with the Client (at the Client's expense) on the advisability of taking steps to resist or narrow such request and (iii) if disclosure is required or deemed advisable, reasonably cooperate with the Client, at the Client's sole cost and expense, in any attempt Client may make to obtain an order or other assurance that confidential treatment will be accorded those terms of this Agreement that are disclosed. The confidentiality restrictions contained herein shall not apply to information that: (i) at the time of disclosure by the Client to B. Riley or its Representatives is, or thereafter becomes, generally available to the public, other than as a direct result of a breach by B. Riley of its obligations under this Agreement; (ii) prior to or at the time of disclosure by the Client to B. Riley or its Representatives was already in the possession of B. Riley or any of its Representatives; (iii) at the time of disclosure is, or thereafter becomes, available to B. Riley or its Representatives from a third-party source, provided that, to B. Riley's or its Representatives' knowledge, such third party is not and was not prohibited from disclosing such Confidential Information to B. Riley; or (iv) is or was independently developed by B. Riley or its Representatives without reference to the confidential information provided to B. Riley by the Client.

## Integration; Severability

This Agreement contains the entire agreement and understanding between B. Riley and the Client concerning the Matter. This Agreement supersedes and replaces all prior negotiations, estimates, proposed agreements, and/or agreements (oral and written) concerning B. Riley's services for the Client in conjunction with the Matter. If any portion of this Agreement shall be held or made unenforceable or invalid by a statute, rule, regulation, decision of a tribunal or otherwise, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect,

**B | RILEY** *Advisory Services*

and, to the fullest extent, the provisions of this Agreement shall be severable.

### Governing Law; Dispute Resolution

The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to choice of law or principles thereof. The parties agree that any disputes arising out of this Agreement shall be submitted to final, binding arbitration conducted in New Castle County, Delaware under the Expedited Arbitration Procedures and Rules of the Judicial Arbitration and Mediation Services Inc. ("JAMS") before a single, neutral arbitrator who shall follow Delaware law and the Federal Rules of Evidence and have no authority to award punitive damages. Either party may enforce a final arbitration award in any court of competent jurisdiction in New Castle County, Delaware including an award of costs, fees and expenses incurred in enforcing the award. The parties shall keep confidential, and not disclose the fact that there is a dispute between the parties, the details of the dispute, the fact of the arbitration and all details relating to the proceeding. Notwithstanding the foregoing, either party shall be entitled to seek injunctive relief in the state or federal courts of the State of Delaware upon a showing that a material portion of this Agreement was violated, and emergency relief is necessary to avoid irreparable harm. The prevailing party in any dispute arising hereunder shall be entitled to recover from the other all fees and costs incurred, including legal fees and costs and the costs of experts, in any proceedings, including, but not limited to arbitration, litigation, bankruptcy, and in any appellate proceedings as well. Notwithstanding the foregoing, in the event a Bankruptcy Case is filed, disputes shall be submitted to the Bankruptcy Court during the pendency of any such case or the same Client's converted case.

### B. Riley Employee Placement Fee

If, at any time during the period that commences on the date of this Agreement and terminates on the date that is six (6) months from the date of the termination or expiration of this Agreement (the "Solicitation Period"), the Client hires a B. Riley employee who works on this engagement during the Solicitation Period, the Client agrees to pay a placement fee to B. Riley in the amount of twenty percent (20%) of the employee's estimated total first year's compensation, including estimated commissions and bonuses, and any signing bonus. Such fee is not subject to reduction even if the employee's employment terminates. The Client will be obligated to pay such fee within thirty (30) days of the first day of the employee's employment by the Client, unless otherwise mutually agreed to by the Client and B. Riley.

### Contact Information

All correspondence should be directed to:

Marshall Glade
B. Riley Advisory Services
3445 Peachtree Rd. Suite 1225 Atlanta, GA 30326
Phone: 470-346-6842
Email: mglade@brileyfin.com

**B | RILEY** *Advisory Services*

## Conclusion

If the arrangements described in this Agreement are acceptable to the Client, and the services summarized above are in accordance with the understanding of the Client, please sign and return a copy of this Agreement, along with the Retainer. This Agreement may be executed in counterparts. Signatures sent by fax or as pdf shall be treated as originals.

*[Signature Page Follows]*



3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Tel: (470) 346-6800
www.brileyfin.com

We look forward to working with you on this Matter.


Yours very truly,


GlassRatner Advisory & Capital Group, LLC
    dba B. Riley Advisory Services


Marshall Glade
Managing Director


Accepted and Agreed:

Group Resources Acquisitions, LLC
Group Resources of Iowa LLC;
Group Resources Incorporated;
Employee Benefits Concepts Inc.


Name: _____     11/4/24
                                      _____
Title: PRESIDENT  & CEO               Date

**B | RILEY** *Advisory Services*

## Schedule A[1]

The Client agrees to indemnify and hold harmless B. Riley and its affiliates (as defined in Rule 405 under the Securities Act of 1933, as amended) and their respective directors, officers, members, managers, employees, agents and controlling persons (B. Riley and each such person being an "Indemnified Party") from and against all losses, claims, damages and liabilities (or actions, including shareholder actions, in respect thereof), joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, or otherwise, which are related to or result from the performance by B. Riley of the services contemplated by, or the engagement of B. Riley pursuant to, this Agreement and will promptly reimburse any Indemnified Party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation, of preparation for or defense arising from any threatened or pending claim, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by the Client. The Client will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions, (i) for any settlement by an Indemnified Party effected without its prior written consent (not to be unreasonably withheld); or (ii) to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from B. Riley's willful misconduct or gross negligence, or breach of fiduciary duty, if any. The Client also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Client or its security holders or creditors related to or arising out of the engagement of B. Riley pursuant to, or the performance by B. Riley of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from B. Riley's willful misconduct or gross negligence, or breach of fiduciary duty, if any.

Promptly after receipt by an Indemnified Party of notice of any intention or threat to commence an action, suit or proceeding or notice of the commencement of any action, suit or proceeding, such Indemnified Party will, if a claim in respect thereof is to be made against the Client pursuant hereto, notify the Client in writing of the same. In case any such action is brought against any Indemnified Party and such Indemnified Party notifies the Client of the commencement thereof, the Client may elect to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party, and an Indemnified Party may employ counsel to participate in the defense of any such action provided, that the employment of such counsel shall be at the Indemnified Party's own expense, unless (i) the employment of such counsel has been authorized in writing by the Client, (ii) the Indemnified Party has reasonably concluded (based upon advice of counsel to the Indemnified Party) that there may be legal defenses available to it or other Indemnified Parties that are different from or in addition to those available to the Client, or that a conflict or potential conflict exists (based upon advice of counsel to the Indemnified Party) between the Indemnified Party and the Client that makes it impossible or inadvisable for counsel to the Indemnifying Party to conduct the defense of both the Client and the Indemnified Party (in which case the Client will not have the right to direct the defense of such action on behalf of the Indemnified Party), or (iii) the Client has not in fact employed counsel reasonably satisfactory to the Indemnified Party to assume the defense of such action within a reasonable time after receiving notice of the action, suit or proceeding, in each of which cases the reasonable fees, disbursements and other charges of such counsel will be at the expense of the Client; provided, further, that in no event shall the Client be required to pay fees and expenses for more than one firm of attorneys (in addition to

---

[1] Capitalized terms used but not defined in this Schedule A shall have the meanings ascribed to them in the Agreement to which this is attached.

**B | RILEY** *Advisory Services*

one local counsel) representing Indemnified Parties unless the defense of one Indemnified Party is unique or separate from that of another Indemnified Party subject to the same claim or action. Any failure or delay by an Indemnified Party to give the notice referred to in this paragraph shall not affect such Indemnified Party's right to be indemnified hereunder, except to the extent that such failure or delay causes actual harm to the Client, or prejudices its ability to defend such action, suit or proceeding on behalf of such Indemnified Party.

If the indemnification provided for in this Agreement is for any reason held unenforceable by or unavailable to an Indemnified Party, subject to Bankruptcy Court authority, the Client agrees to contribute to the losses, claims, damages and liabilities for which such indemnification is held unenforceable or unavailable (i) in such proportion as is appropriate to reflect the relative benefits to the Client, on the one hand, and B. Riley, on the other hand, of any Property Sale as contemplated whether or not such Property Sale is consummated or, (ii) if (but only if) the allocation provided for in clause (i) is for any reason unenforceable or unavailable, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Client, on the one hand, and B. Riley, on the other hand, as well as any other relevant equitable considerations. The Client agrees that for the purposes of this paragraph the relative benefits to the Client and B. Riley of any Property Sale as contemplated shall be deemed to be in the same proportion that the total value received or contemplated to be received by the Client or its shareholders, as the case may be, as a result of or in connection with such Property Sale bears to the fees paid or to be paid to B. Riley under this Agreement. Notwithstanding the foregoing, the Client expressly agrees that B. Riley shall not be required to contribute any amount in excess of the amount by which fees paid B. Riley hereunder (excluding reimbursable expenses), exceeds the amount of any damages which B. Riley has otherwise been required to pay.

The Client will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification or contribution could be sought under the provisions of this Agreement, whether or not any Indemnified Party is an actual or potential party to such claim, action or proceeding, without B. Riley's prior written consent, which consent shall not be unreasonably withheld in the case of any claim, action or proceeding involving only the payment of money damages), unless such settlement, compromise or consent (i) includes an unconditional release of each Indemnified Party from all liability in any way related to or arising out of such claim, action or proceeding and (ii) does not impose any actual or potential liability upon any Indemnified Party and does not contain any factual or legal admission by or with respect to any Indemnified Party or any adverse statement with respect to the character, professionalism, due care, loyalty, expertise or reputation of any Indemnified Party or any action or inaction by any Indemnified Party. The Client's recourse with respect to any liability or obligation of B. Riley hereunder shall be limited to the assets of B. Riley, and the Client shall have no recourse against, and expressly waives its right to bring any claim against, any other Indemnified Party or any of their assets.

In the event that an Indemnified Party is requested, authorized by the Client, or required to appear as a witness in any action brought by or on behalf of or against the Client in which such Indemnified Party is not named as a defendant, the Client agrees to promptly reimburse B. Riley on a monthly basis for all expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel. In addition to any reimbursed fees, expenses or costs outlined hereunder, B. Riley shall also receive from the Client cash compensation of at the then-applicable normal hourly rates set by B. Riley per person, per day, plus reasonable out-of-pocket expenses and costs should B. Riley be required to provide testimony in any formal or

**B│RILEY** *Advisory Services*

informal proceeding regarding the Client.

If multiple claims are brought, at least one for which indemnification is permitted under applicable law and provided for under this Agreement, the Client agrees that any judgment or arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judgment or arbitration award expressly states that it, or any portion thereof, is based solely on a claim as to which indemnification is not available.

# EXHIBIT "D"

[Declaration of Marshall Glade]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re:<br><br>GROUP RESOURCES ACQUISITIONS, LLC, *et al.*,[1]<br><br>Debtors. | Case No. 24-59671-SMS<br><br>Chapter 11<br><br>(Jointly Administered) |

**SWORN DECLARATION OF MARSHALL GLADE IN SUPPORT OF DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF GLASSRATNER ADVISORY & CAPITAL GROUP, LLC DBA B. RILEY ADVISORY SERVICES TO PROVIDE THE DEBTORS A CHIEF RESTRUCTURING OFFICER AND CERTAIN ADDITIONAL PERSONNEL AND (II) DESIGNATING MARSHALL GLADE AS CHIEF RESTRUCTURING OFFICER, EFFECTIVE AS OF NOVEMBER 4, 2024**

Marshall Glade makes this Declaration under oath and pursuant to 28 U.S.C. § 1746, and states:

1.       I am a Managing Director at GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services ("B. Riley").

2.       This Declaration is submitted in support of the Debtors' For Entry of an Order (I) Authorizing the Employment and Retention of GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel and (II) Designating Marshall Glade as Chief Restructuring Officer, Effective as of November 4, 2024 (the "Employment Application").

3.       Unless otherwise stated in this declaration, I have personal knowledge of the facts hereinafter set forth.

---

[1] The following cases are being jointly administered with Group Resources Acquisitions, LLC: Employee Benefit Concepts, Inc. (24-59673-SMS); Group Resources of Iowa, LLC (24-59675-SMS); and Group Resources Incorporated (24-59729-SMS).

4.      I graduated from the University of Georgia with a Bachelors of Business Administration in Accounting and a Masters of Accountancy. I am a Certified Public Accountant licensed in the State of Georgia. I have experience in forensic accounting investigations.

5.      I also have experience serving in fiduciary roles, such as being a receiver and a liquidating trustee. I have served as a chief restructuring officer a number of times.

6.      My biography filed with the Employment Application sets forth experience relevant to the proposed engagement with the Debtors in these cases.

7.      B. Riley has requested a retainer of $50,000 from the Debtors. Based on my experience in similar engagements, and a review of Debtors' business records, that is a reasonable amount of retainer for a project of this scale in the metropolitan Atlanta area.

8.      The engagement letter proposed by B. Riley and myself to Debtors includes an indemnification provision. A copy of that engagement letter is filed with the Employment Application. The indemnification provision is a material inducement for B. Riley and me to provide the services contemplated for the engagement. That indemnification provision is typical of the type of indemnification regularly requested, and obtained, by professionals who provide services similar to what B. Riley and I are providing in these cases.

9.      Subject to this Court's approval of the relief requested, Debtors have requested that I and B. Riley be compensated on an hourly basis, and be reimbursed for the actual and necessary expenses incurred, in accordance with the ordinary and customary rates which are in effect on the date the services are rendered, without the need to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code. B. Riley and I will however file with the Court and provide reports of fees earned, expenses incurred, and time spent by each of the timekeepers who work on Debtors' respective cases during the applicable time period to the Debtors, the Office of the United

2

States Trustee for the Northern District of Georgia and counsel to any statutory committee appointed in the Debtors' cases, if any.

10.     B. Riley is an indirect, wholly owned subsidiary of B. Riley Financial, Inc. (NASDAQ: RILY) ("BRF"), a publicly traded, diversified financial services company.  BRF operates through several consolidated subsidiaries that provide investment banking, brokerage, wealth management, asset management, direct lending, business advisory, valuation, and asset disposition services to a broad client base spanning public and private companies, financial sponsors, investors, financial institutions, legal and professional services firms, and individuals. Additionally, BRF has opportunistically invested in and acquired companies or assets with attractive risk-adjusted return profiles to benefit BRF's shareholders. In addition, BRF owns and operates several uncorrelated consumer businesses and invests in retail brands on a principal basis. B. Riley is a separate legal entity from BRF and BRF's other subsidiaries. BRF and its subsidiaries, including B. Riley, observe appropriate legal formalities as separate entities. BRF and its subsidiaries adhere to customary confidentiality obligations with respect to client information. B. Riley personnel do not have access to the files of other BRF business lines, nor do other business lines have access to B. Riley files.

11.     B. Riley and its affiliates provide services to a wide range of institutions and individuals and may in the past have had, and may currently or in the future have, relationships with parties that may have relationships with the Debtors. In the ordinary course of business, investment funds affiliated with BRF and certain of B. Riley' and its affiliates' employees, as well as investment funds in which such employees may have financial interests, but over whose investment decisions such employees have no input or control, may acquire, hold, or sell long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and

3

financial instruments (including bank loans and other obligations) of, or investments in, the Debtors or other parties that may have an interest in these chapter 11 cases or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights in respect of such securities, financial instruments, and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. Moreover, the B. Riley employees who are working on these chapter 11 cases are subject to compliance mechanisms and policies and procedures designed to prevent confidential, non-public information from being improperly shared.

12.     Affiliates of B. Riley provide valuation opinions on the assets, securities and derivative holdings of various entities and individuals, including business development companies, private equity firms, and hedge funds, which may include debt securities of the Debtors. This work is unrelated to the services that B. Riley intends to provide in these chapter 11 cases. Moreover, such affiliates, through the establishment of an "Information Wall," have separated their employees who provide valuation opinions on assets, securities and derivative holdings from the rest of the employees of B. Riley. This "Information Wall" includes physical and technological barriers, compliance mechanisms and policies and procedures designed to prevent confidential, non-public information and work product from being shared improperly.

13.     In the ordinary course of its business, B. Riley and its affiliates from time to time discuss issues concerning stressed and distressed companies with creditors and prospective creditors that are clients of the firm, or that otherwise contact B. Riley or its affiliates, or that are referred to the firm in light of B. Riley' or its affiliates' reputation for covering such companies and/or relevant industry expertise. At the time of those contacts, it is not known whether any particular company will actually file for bankruptcy, or if any of these creditors and/or potential

creditors will serve on any future committee, or even be a creditor of the relevant estate in the event of a future bankruptcy. B. Riley may communicate with and, when appropriate or requested, send materials to one, or more, of the 20 largest unsecured creditors identified by a debtor and who are, therefore, potential members of a creditors' committee, if B. Riley and its professionals either know, work with, are contacted by, or are otherwise referred to the relevant creditor. In some circumstances, B. Riley and its professionals may contact potential committee members with whom we are not previously familiar.

14.     B. Riley and its affiliates' personnel may have business associations with certain creditors of the Debtors or counsel, or other professionals involved in these chapter 11 cases on matters unrelated to these chapter 11 cases. In addition, in the ordinary course of its business, B. Riley and its affiliates may engage counsel or other professionals in unrelated matters who now represent, or in the future may represent, creditors or other interested parties in these chapter 11 cases or who have represented or currently represent B. Riley and its affiliates in matters unrelated to these chapter 11 cases.

15.     To the best of my knowledge, on matters unrelated to the Debtors, B. Riley and/or its affiliates have provided due diligence, asset appraisal, consultation, enterprise valuation, and/or field exam services in the ordinary course of business to many lenders, investors, and other market participants, some of whom may be creditors, equity security holders, and other parties in interest in these chapter 11 cases.

16.     Although we respectfully submit that the retention of B. Riley is not governed by section 327 of the Bankruptcy Code, in connection with our proposed retention by the Debtors in these chapter 11 cases, we undertook to determine whether we have any conflicts or other

relationships that might cause B. Riley not to be disinterested or to hold or represent an interest adverse to the Debtors.

17.    To determine B. Riley' relationship with parties in interest in these chapter 11 cases, B. Riley obtained from the Debtors or their representatives the names of certain of the Debtors' significant creditors and other parties-in-interest (individually an "Interested Party" and collectively, the "Interested Parties"). The list of Interested Parties is attached hereto as Schedule 1.  A search was performed for connections to the Interested Parties during the past three years, and based on that review, B. Riley represents that, to the best of its knowledge, B. Riley knows of no fact or situation that would represent a conflict of interest for B. Riley with regard to the Debtors.

18.    The review of the Interested Parties described herein was conducted by BRF pursuant the following procedures: We check the internal databases of BRF and its subsidiaries, and, additionally, we ask our corporate senior management, finance, accounting, compliance and legal departments, as well as managers at our investment banking, retail, real estate, appraisal, advisory, liquidation and wealth and capital management affiliates to review the list of Interested Parties and to identify and describe any relationships.  With respect to BRF's wealth management subsidiary, we compared the names of the Interested Parties to a list containing the names of those private wealth clients with more than $5 million under management as of May 31, 2024.  Schedule 2 includes a list of connections between B. Riley affiliates and parties listed on Schedule 1.

19.    Based on the process set forth herein, it is my understanding that the overall design and implementation of B. Riley' current procedures provide a reasonable level of comfort to BRF and B. Riley that relationships and potential conflicts will be identified. Continued inquiry will be made following the filing this Declaration by undertaking the same procedures described herein

and in the Declaration on a periodic basis, with additional disclosures to be filed in this Court if necessary or otherwise appropriate.

20.    Except as otherwise disclosed herein, and insofar as I have been able to ascertain after due diligence, to the best of my knowledge, information, and belief after reasonable inquiry, neither I, B. Riley, nor any of the professionals or employees participating in or connected with B. Riley' engagement with the Debtors, represent any party in interest or any other entity in these chapter 11 cases other than the Debtors. Thus, B. Riley is a "disinterested person," as that term is defined in Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b).  Except as outlined above, B. Riley' due diligence has revealed that B. Riley and its professionals:

    a.  do not hold or represent any interest adverse to the Debtors or its creditors;
    b.  are disinterested so as to render B. Riley eligible to serve as store closing consultant for the Debtors under Bankruptcy Code § 327(a);
    c.  are not a creditor, security holder, or insider of the Debtors and do not represent any entity (or its attorneys or accountants) other than the Debtors in connection with this Bankruptcy Case;
    d.  are not, and were not, within two (2) years before the Petition Date, a director, officer, or employee of the Debtors;
    e.  do not have any interest materially adverse to the interests of the Debtors or its estate or any class of creditors or equity security holders of the Debtors, by reason of any direct or indirect relationship to, connection with, or any interest in, the Debtors or for any other reason; and
    f.  except as set forth herein, have no connections with the Debtors, creditors, equity interest holders, or any party interest.

21.    To the best of my knowledge, information, and belief, insofar as I have been able to ascertain after reasonable inquiry, B. Riley has not been retained to assist any entity or person other than the Debtors on matters relating to, or in direct connection with, these chapter 11 cases.

22.    In addition, B. Riley does not believe that any relationships that B. Riley or any of its professionals or employees participating in or connected with B. Riley' engagement with the Debtors may have with any Interested Parties in connection with any unrelated matter will interfere with or impair B. Riley' representation of the Debtors in these chapter 11 cases.

7

23.    Based on the above-described investigation and due diligence performed by B. Riley or as listed on Schedule 2, B. Riley also believes that approval of its employment as requested in the Application is not prohibited under the provisions of Bankruptcy Rule 5002.

24.    Based on the results of its review, to the best of my knowledge, except as discussed herein, B. Riley does not have an active relationship with any of the parties listed in Schedule 1 in matters related to this proceeding.

25.    In addition to the above, B. Riley has provided and could reasonably be expected to continue to provide services unrelated to the Debtors' cases for some of the various other entities shown on Schedule 2.  To the best of my knowledge, no services have been provided to these parties-in-interest regarding their rights in these chapter 11 cases, nor does B. Riley' involvement in these chapter 11 cases compromise its ability to continue such consulting services.

26.    B. Riley and its affiliates appear in numerous cases and proceedings and participate in transactions that involve many different professionals, including attorneys, accountants, investment bankers, and financial consultants, who may represent claimants and parties-in-interest in the Debtors' cases.  In addition, B. Riley and its affiliates may have in the past performed, currently be performing, or may perform in the future advisory services for various attorneys and law firms, either directly or on behalf of such attorneys' or firms' clients, and may have in the past been, currently be, or may in the future be represented by attorneys and law firms, some of whom may become involved in this proceeding.  Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in the matter upon which B. Riley is to be employed.

27.    B. Riley does not believe it is a "creditor" of the Debtors within the meaning of § 101(1) of the Bankruptcy Code.  Further, neither I nor any member of the B. Riley engagement

8

team servicing the Debtors, to the best of my knowledge, is a holder of any of the Debtors' debt or equity securities.

28.     To the best of my knowledge, B. Riley is a "disinterested person" within the meaning of § 101(14) of the Bankruptcy Code, as referred to in § 327(a) of the Bankruptcy Code.

29.     Except as set forth herein, neither I, B. Riley, nor any principal, consultant or employee thereof has agreed to share or will share any portion of the compensation to be received from the Debtors by B. Riley with any other person other than the principals and regular employees of B. Riley.

30.     Pursuant to Bankruptcy Rule 2014(a), B. Riley will supplement its disclosure to the Court if any facts or circumstances are discovered that would require disclosure.

31.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

This 13th day of November, 2024.

Atlanta, Georgia.

 _/s /    Marshall Glade_____
Marshall Glade

[Notarization unnecessary pursuant to 28 U.S.C. § 1746]

9

SCHEDULE 1
LIST OF INTERESTED PARTIES

Group Resources Acquisitions LLC;
Group Resources of Iowa LLC;
Group Resources Incorporated; and
Employee Benefit Concepts Inc (Michigan corporation)
Group Resources of Texas LLC;
Group Resources of Houston LLC;
Group Resources of Jamaica LLC;
Group Resources Holdings Inc.
Andy Willoughby;
Thomas Byrd;
David Obermeyer
First Horizon Bank
Gwinett County Tax Commission
37, Building Products, LT
A&B Logistics Inc
ADP, LLC
Angaria LLC, dba Home Health
Arcona Leather
Aries Marine Corporation
Ashcraft Distribution Corp
AT&T
Atlanta Development Authority
AVI
Axis Contracting, INC.
B Y Water District
Badgepass
Baldwin County Commissioners
Bay-Houston Operations, LLC
Bell Tower Group, LLC
Benefitfocus.com, INC.
Bennet County Hospital
Bennet Motor Express MGMT Inc
Black Hills Reg Eye Refractive
Black Hills Reg Eye Surgery CE
Black Hills Regional Eye Inst
Blossom Home Healthcare SVC
Bright Home Health
Brookhaven Christian CDC Attn: Della Moore
Brookings Deuel Rural Water
BT Endeavors, CO.
Buffalo County

10

CAH
Calvary Temple of Irving
Campell County
Careoperative LLC
Central Licensing Bureau, Inc
Century Link
Change Healthcare
Change Healthcare Pymt Mgmt
Charles Mix County
Christian Roach
Ciena Healthcare Management
Cigna Corporation c/o US Bank  Lockbox #645014
Cintas Corp
City of Alma
City of Auburn Hills
City of Lapeer
Clark Rural Water System Inc
COL
Colonial Life Processing Center
Comcast
Consumers Energy
Crown Pointe Communities LLC
CSI L.L.C
Customized Consulting
Dale Grimes Enterprises, Inc.
Datapath Inc.
DCU
Delta Centrifugal, LLC
Denton Central Appraisal Distr
Detmar Corporation
Dixon County
Dort Fed Credi
Dragun Corporation
Easpointe Com
EDS
El Paseo Mexican Restaurant SP
Employee Benefit Concepts
Essentially Chic
Fair Health, Inc.
Fedex
Fibercomm
Fidelity Investments Institutional OP
First Security

11

Freedom Hospice
Frontline Source Group Holding
Fundg-Jan 2020
G-Texas Custom Catering Attn: Debbie Redfield
GCP
Glenn Thurman Inc
Global Concessions, Inc.
Gordon Advisors, PC
GPA Global
Grace Home Health, INC
Gregory County
Group Resource
HAT
Hatch Stamping Company
Haven Manufacturing Corp
Heat Treating
Heritage Homes of Nebraska
House of Hawk Transportation
HTS
HTS Trojan
Hub International Midwest Limited
Hughes County
Hutchinson County, SD
Internal Revenue Service
Intinsage
IPFS Corporation
Iron Mountain
Iseman Homes
J&H Trans/ WEIG
J&H Weigand
JHW
KAG
KB Components Dallas
Kingsbury County
Lakeshore Healthcare Services
Language Line
Larc Asset Management & Realty
Laser Mechaniama
Lintel, Inc.
LLEBROC Industries LLC
Mack Iron Works Company
Mail House Inc.
Mainline Site Development

12

Marco
Marro Transportation
McIntosh County Board of Comm
Meade County
Medciphers, LLC
Mellette County
Metro Atlanta Chamber
Michael Johnson Performance
Michigan Grower Products Inc
Mid Dakota Rural Water System
MidAmerican Energy
Milner Inc.
Milner, Inc.
Moc-FV Comm. School District
Mr C's Group Inc
MRCO LLC
MSE Solutions Inc
Mutual of Omaha
Nocona General Hospital
North Central Assembly of God
On Time, Inc.
Optum
Orange City
Perimeter Office Products
Phia Consulting Group
Pitney Bowes Global Financial Services
PPLSI
PPO USA, Inc.
Premium
Prolink Home Health Corp
Promptime Home Healthcare Serv
Prudential Healthcare Services
Purchase Power
QA/QC LLC Dba Construction
Quickfire Restaurants, LLC
Reliant Worldwide Plastics
Remote Imagery Technologies
Ringmaster Technologies, Inc.
Robert W Woodruff Library
Riovin, Inc
Sea Palms Costal Management
Smart Data Solutions
Spectrum Aerospace, Inc.

Stanley County
Stinger Chemicals
Strategic Underwriting
Sutton Frost Cary LLP
Technicolor Inc
Texas Refinery Corp
THA Services
Tonan, Inc
Toshiba Financial Services
Total Hvac
Travel Incorporated
Tru-Vision Plastics Inc
United Community Bank
Vican, Inc.
Web Water Development Assoc
Weener & Nathan, LLP
Wiegand Crushing Co.
Winbco Tank Company
WPS
Wyandotte PS
Zelis Payments Holdings LLC
Zemer International, LLC
Ziebach County
Zipari, Inc.
Ciena Healthcare c/o David Stobb, GC
Dixon County
GreatAmerica Financial Srvcs
Heritage Homes
Cienna Healthcare c/o David Stobb, GC
Dixon County
Heritage Homes
Ciena Healthcare c/o David Stobb, GC
AIA Benefit Advisors, Inc.
Alliant Insurance Services, Inc.
American Health Holding, Inc
Arizona Benefit Plans
AT&T
Benefit Source
Benefitfocus.com, Inc. Attn: Accounts Receivable
Benefits Dallas
Bernard Williams & Company, LLC
Boston Mutual Life Insurance Co.
Bosworth & Associates

Careoperative LLC
Centene Corporation
Change Healthcare
Change Healthcare Pymt Mgmt
Ciena Healthcare c/o David Stobb, GC
Cigna Corporation c/o US Bank  Lockbox #645014
Cintas Corp
Coble-Cravens Financial Services
CoVerica, Inc
Custom Benefits
Customized Consulting
David Bojanic
David R. Weber
Dennis A Wales, LLC
DMS Insurance Agency of TX Dba Sleeper
eHealth Technoloigies
ELAP Services, LLC
Elkhorn Agency
Fair Health, Inc.
Fedex
Fidelity Investments Institutional OP
First Health Group
Flexcare Digital Health
Frank Benefits Group Inc.
Frost Insurance Agency
Gallagher Benefit Services
Gallagher Benefit Serices Inc
Great Northern Benefits
Healthiest You c/o Teladoc, Inc.
Higginbotham and Associates
Hub International Midwest Limited
Inpro Insurance Group
Insurance Office of America
Insurance Resources Unlimited
Intl Insurance Agency Services
Intl Insurance Services
IR & AS
Iron Mountain
Joe Lucido
Kapnick Insurance Group
Lakeland Care Attn: Finance Dept
Language Line
Liberty Mutual Insurance

15

Lincoln Financial
Mail House Inc.
Marco
Marsh & McLennan Agency LLC
Mason McBride Inc.
Michael A Krause & Associates
Michigan Planners Attn: Accounting
MidAmerican Energy
Milner, Inc.
Mutual of Omaha Policyowner Services
New Millenium Finance
NFP Corporate Services
Oakbridge Insurance Agency, LLC
OneDigital Health and Benefits
Optum
Pace Underwriters, LLC
Park Smmit
Patriot Insurance
Pitney Bowes Global Financial Services
PPLSI
PPO USA, Inc.
Private Health Care Systems
Purchase Power
Reliance Standard Life Insurance
Ringmaster Technologies, Inc.
Risty Benefits
Rockport Benefits
Skeleton-Morris Associates
Skyward Speciality Insurance
Strategic Underwriting Solutions
Synergy Healthcare USA, LLC
Teladoc, Inc. Accts Receivable Dept 3417
Toshiba Financial Services
Union Security Insurance Company c/o Assurant EE Benefits
US Benefits Insurance Services
Van Englehoven Agency
Voltaire Health LLC
Warner Pacific Insur. Svcs Inc
Weener & Nathan, LLP
Zipari, Inc.

SCHEDULE 2
RELATIONSHIPS BETWEEN B. RILEY AND INTEREST PARTIES

| Name of Entity Searched | Name of Entity and/or Affiliate of Entity in Database | Disclosure |
|---|---|---|
| Comcast | Comcast Cable | B. Riley provides advisory services to Comcast Cable in matters unrelated to this opportunity. |
| Hatch Stamping Company | Hatch Stamping Company | BRF subsidiaries have appraised the assets of Hatch Stamping Company. |
| Liberty Mutual Insurance | Liberty Mutual Insurance | BRF subsidiaries have appraised the assets of Liberty Mutual Insurance. |
| MidAmerican Energy | MidAmerican Energy | B. Riley provides advisory services to MidAmerican Energy in matters unrelated to this opportunity. |
| Technicolor Inc. | Technicolor Postworks | BRF subsidiaries have appraised the assets of Technicolor Postworks. |